# Wytheville.

## ARTHUR C. HUMPHREYS v. JEANE CARTER HUMPHREYS, NOW KNOWN AS JEANE CARTER STRONG.

### June 12, 1924.

1. DIVORCE—*Foreign Divorce—Full Faith and Credit Clause of the Constitution.*—The full faith and credit clause of the Constitution of the United States does not compel the recognition of a foreign divorce obtained on constructive service upon defendant in a State other than that of the matrimonial domicile.

2. DIVORCE—*Comity—Recognition of Foreign Divorce on the Ground of Comity.*—A foreign divorce obtained on constructive service upon the defendant in a State other than that of the matrimonial domicile is recognized in this State on the ground of comity.

3. DIVORCE—*Recognition of Foreign Divorce—Public Policy of the State.*—The public policy of the State, as evidenced by its legislation with reference to divorces granted by its courts upon constructive service, and otherwise, favors the recognition, on the ground of comity, of a foreign divorce obtained on constructive service upon the defendant in a State other than that of the matrimonial domicile.

4. DIVORCE—*Foreign Divorce—Faith and Credit to be Given Foreign Decrees Under Section 6205 of the Code of 1919—Case at Bar.*—The Code of 1919, section 6205, provides that the records and judicial proceedings of any court of the United States, or of any State, properly attested, shall have such faith and credit given to them in this State as they have in the courts of the State whence the records come. In the instant case a decree of divorce obtained in Nevada on constructive service by plaintiff, a resident of Nevada, against defendant, a resident of Virginia, duly attested, is a "record" and a judicial proceeding of the Nevada court, in which it was obtained, entitled to full faith and credit in the courts of Nevada, and it follows that the policy of Virginia, as declared by the statute, gives equal faith and credit to such "judicial proceedings" in the courts of Virginia.

5. DIVORCE—*Foreign Divorce—Recognition on the Ground of Comity.*—The requirements of the law of Nevada for obtaining a divorce when the defendant is a nonresident of that State are almost identical with those of the State of Virginia. A State which itself grants divorces on constructive service should, on principles of comity, recognize

such divorces when granted by other States. Accordingly, a Nevada divorce will be recognized in Virginia on the ground of comity.

6. DIVORCE—*Foreign Divorce—Comity—Divorce Obtained by Fraud.*—Of course a foreign divorce, based upon fraud, will not be recognized as a matter of comity. But in the instant case the record disclosed nothing to warrant a suggestion that plaintiff procured her Nevada divorce by fraud.

7. HUSBAND AND WIFE—*Domicile—Right of Wife to Change Her Domicile.*— Such cruel treatment on the part of the husband, though unaccompanied by actual violence, that to live with him longer meant the permanent impairment of the wife's health, if not the loss of her mind, justifies a change of domicile on the part of the wife.

8. DIVORCE—*Cruelty—"Bodily Hurt."*—The Virginia statute (Code of 1919, section 5104) provides that "cruelty, reasonable apprehension of bodily hurt, abandonment or desertion," shall be a ground for divorce *a mensa.* The words "bodily hurt" as here used are not restricted to a physical assault upon the body, but include any course of conduct which leads to serious nervous or mental disease.

9. HUSBAND AND WIFE—*Domicile—Wife's Change of Domicile.*—A wife may establish a separate domicile whenever it is necessary and proper that she should do so. And the courts of either State may in such case determine the status of the party domiciled there, and such determination will be entitled to full faith and credit in every other State.

10. HUSBAND AND WIFE—*Divorce—Wife's Change of Domicile—Intention to Obtain a Divorce—Case at Bar.*—In the instant case it sufficiently appeared from the record that the complainant wife went to Nevada with the intention to acquire a *bona fide* residence in that State. She remained in Nevada for nearly eighteen months.

*Held:* That notwithstanding that complainant went to Nevada for the purpose of obtaining a divorce, it did not follow that she did not acquire a *bona fide* residence there.

11. DOMICILE—*Change of Domicile with Purpose of Availing Oneself of the Laws of Another State.*—A person may legitimately move to another State in order to avail himself of the laws of that State, and this includes the right to move into the jurisdiction of another State for the purpose of procuring a divorce, the only requirements being absolute good faith in the taking up of such residence and of the *animus manendi.* In other words, the *factum* of residence and the *animus manendi* prove the domicile.

12. DIVORCE—*Foreign Divorce—Recognition in Virginia of Foreign Divorce a Vinculo Obtained on the Ground of Cruelty.*—The fact that cruelty is a ground for an absolute divorce in Nevada, while in Virginia it is ground only for a divorce *a mensa,* which may later be converted into a divorce *a vinculo,* does not affect the application of the principles of comity to a Nevada decree obtained on constructive service

against a resident of Virginia on the ground of cruelty. Such a slight difference in the law of the two States is not a matter which can be said to so affect the public policy of Virginia as to warrant the courts of Virginia in refusing to recognize the judicial action of a sister State.

13. DIVORCE—*Foreign Divorce—Recognition on the Ground of Comity.*—Foreign divorce decrees should be recognized by the courts of Virginia, except when to recognize the foreign divorce would be a violation of the morals or public policy of the State.

14. JUDGMENTS AND DECREES—*Necessity of Personal Service—Foreign Divorce—Decree for Alimony.*—Where in divorce proceedings a Nevada court failed to get actual service of process in the territorial limits of that court's jurisdiction upon the defendant, a resident of Virginia, and he declined to voluntarily appear, no valid personal judgment could be entered against him, and no effect can be given to that portion of the court's decree which allowed alimony and counsel fees in favor of the plaintiff in the Nevada suit.

Appeal from a decree of the Law and Chancery Court of the city of Norfolk. Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*E. R. F. Wells* and *Jas. E. Heath,* for the appellant.

*Williams, Loyall & Tunstall,* for the appellee.

WEST, J., delivered the opinion of the court.

Arthur C. Humphreys and Jeane L. Carter were married on April 12, 1905, in Fauquier county, Virginia, and took up their residence in Norfolk, Virginia.

According to the testimony of the appellee, appellant continuously, from a date not long after their marriage, treated her with extreme cruelty, without cause or provocation, and by reason of his inhuman and brutal treatment of appellee, her health was broken down and she was forced to and did leave him on several occa-

sions, returning upon his promise to amend his conduct
and to treat her with love, kindness and consideration,
which he failed to do; and on the 31st day of December,
1916, the appellee was forced to again leave the appel-
lant, and from thence she did not return to or live with
him; all because of his extreme cruelty and the repeated
and continuous acts of such cruelty, which rendered her
life miserable, endangered and destroyed her health, and
rendered further cohabitation and life with him a men-
ace to her life.

Her repeated attempts to live with appellant re-
sulted in her complete break-down, first physically and
then mentally.

In 1908-9 appellant became seriously involved in a
business trouble, and on February 3, 1909, in fulfilment
of an ante-nuptial agreement, he conveyed to his wife
certain valuable real estate in the city of Norfolk; and
about the same time transferred to her certain stocks
and bonds.

On the occasion of her first break-down appellee went
back to her old home in Warrenton, Fauquier county,
and thence to a sanitarium in Washington, D. C., con-
ducted by a Miss Silvester. Thence she went to Dr.
Sinkler's hospital, in Philadelphia, where she remained
about three months, and was advised to go south until
warm weather. She accordingly went to Somerville,
South Carolina, for about six weeks, returning to Nor-
folk in June. Upon her return appellant resumed his
dictatorial and abusive conduct toward her with the
result that she "went to pieces" within a month and re-
turned to her people in Warrenton.

Appellee returned to Norfolk in the autumn and re-
mained until near the end of the following summer. The
result of her stay was a repetition of her former experi-
ence, and in August she left and stayed until December

She then returned to Norfolk in good health, but her husband's attempted domination of her life was continued and each time she returned, "it seemed    *    * he grew worse than the time before."

She then left and went to her brother in Florida, where she stayed eighteen months.

During this absence appellant made no contribution whatever to her support.   He continued to live in the house which he had deeded to her, but gave her not a penny.

In the summer of 1915, they met in Washington, D. C., and decided to again try to live together, and, after a visit to a friend, she returned to Norfolk in October.   In the following January her nerves were in such condition that she had to be sent to the Westbrook Sanitarium, for treatment.   Her husband then said if she broke down again he would "send her to the asylum at Williamsburg."

She remained at the Westbrook for three months, but upon her return to Norfolk she received the same treatment she experienced before, and her nervous breakdown was accompanied by nausea in an intensified form. After a short stay she was forced to return to Westbrook for six weeks.   Again she came back to Norfolk and the nausea returned to her.   She soon lost all she had gained at the sanitarium, and after a month's stay she went to Warrenton.   In September, 1916, she returned to Norfolk for a short stay, but with the same result upon her health.   On December 15, 1916, she came back to Norfolk for what proved to be her last attempt to live with her husband.

Reaching the conclusion that she was no longer required to jeopardize not only her physical but her mental well being, on December 31, 1916, she left Norfolk for her brother's home in Warrenton.   Before leaving

she informed her husband that she did not intend to return.   She remained in Warrenton several months and then visited her sister, Mrs. Hayes, with whom she spent the summer of 1917.   She next visited the home of Mrs. Edward Carter, where she stayed until she left for Reno, Nevada, on January 5, 1918.

Upon her arrival she engaged a home with a private boarding house and entered a business college.   Later she took a position in a department store, which she held for nearly a year, becoming a registered voter and voting in several elections.   In addition, she worked in a knitting mill at night.

On July 23, 1918, appellant was informed by his Reno attorney that appellee had on July 22, 1918, instituted suit against him for a divorce.   A copy of the summons and complaint in the suit was served on appellant on or about August 1, 1918, by the deputy sergeant of the city of Norfolk, Virginia.   He received practically the same notice as that required to be given a nonresident defendant under the law of Virginia.   While appellant made no appearance, his Reno attorney kept him informed as to every step taken in the case.

The ground of the suit was extreme cruelty, not taking the form of traumatic injury, but producing an effect on the physical and mental well-being of the appellee more serious than would have been caused by a blow upon her person.   On September 17, 1918, the Second Judicial District Court of the State of Nevada, for the county of Washoe, entered a decree granting appellee an absolute divorce *a vinculo*, and a personal decree against appellant for alimony at the rate of $250.00 a month and an allowance of $500.00 for attorneys' fees.

She remained in Reno until the latter part of May, 1919, when she came East, on the advice of her counsel at Norfolk, to attend to matters in connection with her

contemplated suit against appellant for the recovery of the property conveyed to her in pursuance of the ante-nuptial agreement.    She had intended to return to Reno in November, 1919, but the property suit delayed her.    After her return from the West she secured a government position in Washington through a senator from Nevada, going to work February 1, 1920.

On October 17, 1919, she instituted in a Norfolk court an action of ejectment against appellant to recover from him the home in Norfolk, where he was living, which he had deeded to her a few years after their marriage.

On May 29, 1920, appellee married Richard U. Strong, of Washington, D. C.

In September, 1920, appellant instituted this divorce suit against Jeane Carter Humphreys, then known as Jeane Carter Strong, in which he charged that the Nevada divorce obtained by her was null and void, that her pretended marriage to Richard U. Strong was void, and that he was entitled to a divorce from her on the ground of desertion and of her adulterous intercourse with Strong.

To this bill of complaint, appellee filed her answer, together with a certified copy of the judgment roll of the Nevada court, in which she claimed that the decree of the Nevada court was entitled to full faith and credit under the Constitution of the United States, and in addition that the Virginia court should at least recognize it through comity.    She claimed that the Nevada decree gave her an absolute divorce from appellant, and that her subsequent marriage with Strong was legal and valid.

Evidence was taken by both parties, the appellant's evidence being in some respects in conflict with that of the appellee.

Further reference may be made to the evidence during the course of this opinion.

Upon a final hearing on September 27, 1921, a decree was entered recognizing the decree of the Nevada court on the ground of comity, denying the prayer of appellant for a divorce, and dismissing his bill.   To that decree this appeal was allowed.

The appellant assigns as error the action of the court:

1. In recognizing as valid and binding the Nevada divorce decree;

2. In refusing to hold that the Nevada divorce decree was void because Mrs. Humphreys had never acquired a *bona fide* domicile in that State, and also because the court in that State which rendered the decree had never acquired jurisdiction of appellant;

3. In refusing to grant to appellant a divorce from his wife on the grounds of desertion and adultery.

This case is one of first impression in this court.

There is a sharp conflict of authority on the subject of the effect to be given by the courts of one State to a foreign decree of divorce obtained upon constructive service.

Some of the early cases sustain the proposition, that under the "full faith and credit" clause of the Constitution a conclusive effect should be given to such divorces, while others sustain the proposition that such a decree is without any effect in a foreign jurisdiction.

[1] The leading case on the subject is *Haddock* v. *Haddock*, 201 U. S. 562, 26 Sup. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1, in which the Supreme Court of the United States was required to decide, for the first time, whether the "full faith and credit" clause of the Constitution *compelled* the recognition of such a decree as the one now under consideration.   The court decided,

as the only Federal question involved, that it did not, and expressly left to the State courts the application of the principles of State comity where they may elect to apply the same.

[2] According to the weight of authority, a foreign divorce obtained on constructive service in a State other than that of the matrimonial domicile should be recognized on the ground of comity.

In 19 Corpus Juris, page 373, the law is stated thus: "Where, however, the State of plaintiff's domicile is not also the matrimonial domicile, a decree of divorce based upon substituted service and without personal jurisdiction over defendant, although enforceable in the jurisdiction where rendered, is not entitled to obligatory enforcement in other States in virtue of the full faith and credit clause of the Federal Constitution, although the State courts are not prevented from recognizing such decrees on principles of comity if they see fit, and will do so, as a rule, unless contrary to public policy or to good morals. The fact that the domestic court grants divorces under somewhat similar circumstances is a reason why, as a matter of comity, the validity of a foreign divorce should be recognized."

To the same effect are, *Gildersleeve* v. *Gildersleeve*, 88 Conn. 689, 92 Atl. 684, Ann. Cas. 1916-B, 920; *Joyner* v. *Joyner*, 131 Ga. 217, 62 S. E. 182, 18 L. R. A. (N. S.) 647, 127 Am. St. Rep. 220; *Kenner* v. *Kenner*, 139 Tenn. 211, 201 S. W. 779, L. R. A. 1918-E, 587; *Howard* v. *Strode*, 242 Mo. 210, 146 S. W. 792, Ann. Cas. 1913-C, 1057; *McCormick* v. *McCormick*, 82 Kan. 31, 107 Pac. 546; *Buckley* v. *Buckley*, 50 Wash. 213, 96 Pac. 1079, 126 Am. St. Rep. 900.

[3] The public policy of the State of Virginia, as evidenced by its legislation with reference to divorces granted by its courts, and otherwise, favors the recog-

nition, on the ground of comity, of the Nevada divorce
as granted.

[4] The Virginia Code of 1919, section 6205, pro-
vides: "The records and judicial proceedings of any
court of the United States, or of any State, or of any
country subject to the jurisdiction of the United States,
attested by the clerk thereof, with the seal of the court
annexed, if there be a seal, and certified by the judge,
chief justice, or presiding magistrate of such court, to be
attested in due form, shall have such faith and credit
given to them in every court within this State as they
have in the courts of the State, territory, or district,
whence the said records come."

There can be no doubt that the record of the Nevada
case filed with the appellee's answer in the instant case,
attested by the clerk and certified by the judge to be
attested in due form, is a "record" and a "judicial pro-
ceeding" of the Nevada court.   It is equally certain
that full faith and credit would be given to this "rec-
ord" in the courts of Nevada.   It follows that the policy
of Virginia, as declared by the statute quoted, gives
equal faith and credit to such "judicial proceeding" in
the courts of Virginia.

West Virginia has a statute in the same language of
the Virginia statute, except the addition made by the
revision of the Code of 1919, which addition appears in
the note to this section.

In the case of *Caswell* v. *Caswell*, 84 W. Va. 575, 100
S. E. 482, the West Virginia statute was construed.   In
that case the parties were married in West Virginia in
1877.   In 1895 the husband obtained a divorce in Okla-
homa, which became absolute in 1896.   The petition in
the divorce suit alleged that the husband had been a
resident of Oklahoma for more than ninety days (the
period of residence required under the Oklahoma law

at that time).   The wife did not appear in the suit, but
an order of publication was issued against her and the
decree of divorce recited further that a copy of the pe-
tition with a copy of the publication of notice attached
thereto had been received by her fifteen days before the
case was set down for trial, a formality required by the
law of Oklahoma.   It was contended that the husband
had never been a resident of Oklahoma, but all the time
a resident of Parkersburg, W. Va., where, in fact, he
appears to have lived and died except for such period of
time as he may have been absent in Oklahoma.   The
court held that the Oklahoma decree was valid; that the
policy of the West Virginia court was to recognize such
decrees, as shown by the statute to which reference has
been made as being a counterpart of the Virginia stat-
ute; and in the course of its opinion used the following
language:

"(7) The copy of the proceedings from the District
Court of Logan county, Oklahoma, being duly and prop-
erly certified, and it not appearing therefrom that the
court was without jurisdiction, and the decree being
such as is entitled to full faith and credit in the courts of
that territory, now the State of Oklahoma, the policy of
our law, as declared in section 19 of chapter 130 (sec-
tion 4875, Code), entitled it to the same faith and credit
in the courts of this State.   *Haddock* v. *Haddock*, 201
U. S. 562, 26 Sup. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1,
on which plaintiff relies, does not determine the law of
this State.   That was a case, which went up from the
Court of Appeals of the State of New York, and the de-
cision therein turned upon the policy of that State,
which was not to recognize as binding upon one of its
citizens a decree of divorce obtained in a court of a sister
State, upon a service of process by order of publication,
when it appeared that the parties had never cohabited.

as man and wife in the State wherein the divorce was decreed.   It was held in that case, by a divided court, that section 1 of article 4 of the Constitution, requiring the courts of each State to give full faith and credit to the public acts, records and judicial proceedings of every other State, did not compel a State court, in violation of the State's own policy, to give full faith and credit to a default decree of divorce, based upon an order of publication, when it appeared there had been no matrimonial residence of the parties in the State wherein the divorce was obtained.   But the policy of our State, as shown by the statute above referred to, differs from the policy of the State of New York.   No lack of jurisdiction in the Oklahoma court appearing, our conclusion is that the lower court properly overruled the first exception to defendant's answer."

[5] The requirements of the law of Nevada for obtaining a divorce when the defendant is a nonresident of that State are almost identical with those of the State of Virginia.   Each requires an order of publication; each requires the defendant to be given notice by mail.   The only difference between the two is that section 6171 of the Code of Virginia requires merely a copy of the order of publication to be mailed to the defendant; while the Nevada law provides for a more effective notice by requiring a copy of the summons and the petition to be so mailed.

The courts of Virginia, weekly, if not daily, grant divorces on the same kind of notice.   If we expect the marital status of persons, when fixed by Virginia courts, to be respected by the courts of our sister States, we cannot ourselves consistently repudiate similar divorces granted in other States, when their validity is questioned in this State.   A State which itself grants divorces on constructive service, should, on principles of

comity, recognize such divorces when granted by other States.

In 9 R. C. L., page 517, we find this: "The fact that the statutes of the State in which the foreign divorce is sought to be availed of, authorize its courts to grant divorces in favor of a resident plaintiff against a nonresident defendant, is recognized as evidencing the policy of the State as to foreign divorces under similar circumstances; and further evidences an intention that the courts should not refuse to accord to decrees rendered in the courts of a sister State against nonresident defendants, who have not submitted themselves to the jurisdiction of such courts, the efficacy claimed for their own decrees, where liable to the same objection."

In the case of *Gildersleeve* v. *Gildersleeve, supra,* the court says: "We certainly cannot consistently complain of the foreign divorce which was granted to this defendant as being one obtained by methods not consonant with our public policy as having been granted against a nonappearing nonresident who was not served with process within the foreign jurisdiction. Our statutes provide, and have long provided, for service upon nonresidents precisely like that resorted to by the South Dakota court, and authorized the grant of divorces upon such service."

In *Kenner* v. *Kenner, supra,* the court states the rule as follows: "The fact that the State in which recognition is sought provides by its own laws (as in Tennessee, Sh. Code, 4203, 4207), for the rendering of such decrees in favor of a resident against a nonresident on publication, indicates the duty of according validity, on the ground of comity, to similar action in other States, where there is no material evidence of unfairness and the proceedings are not open to an attack for fraud, as previously explained. *Joyner* v. *Joyner, supra.* In our

own State, in a rather recent case, this policy has been declared. *Toncray* v. *Toncray*, 123 Tenn. 476, 491, 492, 131 S. W. 977, 34 L. R. A. (N. S.) 1106, Ann. Cas. 1912-C, 284."

In *Felt* v. *Felt*, 59 N. J. Eq. 606, 45 Atl. 105, 47 L. R. A. 546, 83 Am. St. Rep. 612, the law is stated as follows:  "That the public policy of New Jersey does not require that recognition should be refused to a decree of divorce rendered by a court of a sister State, because the defendant had her domicile in another State, and was not within the jurisdiction of that court, seems to me plain.  State policy, when determined by the legislature, controls the judicial branch of the government; and the legislature of New Jersey, by vesting in our court of chancery sole jurisdiction over the subject of divorce, and then authorizing it to render decrees divorcing, *a vinculo*, resident complainants from nonresident defendants, after obtaining jurisdiction over the latter by publication, and notice served out of the State upon, or mailed to the postoffice address of, the latter, has, as it seems to me, declared what our policy in this regard shall be.  That it was intended by the legislature that decrees of divorce so rendered should be valid in every jurisdiction, so far as it had the power to make them so, goes without saying; and it cannot be conceived that it was intended that we should refuse to accord to the decrees rendered in the courts of our sister States against nonresident defendants, who have not submitted themselves to the jurisdiction of such courts, the efficacy we claim for our own, when liable to the same objection."

Upon the question, whether Virginia shall recognize through comity the decree rendered by the Nevada court, the appellant relies largely upon the following cases: *Irby* v. *Wilson*, 21 N. C. 568; *Reel* v. *Elder*, 62

Pa. St. 308, 1 Am. Rep. 414; *Parker* v. *Parker*, 222 Fed. 186, 137 C. C. A. 626; *Williams* v. *Williams*, 130 N. Y. 193, 29 N. E. 98, 14 L. R. A. 220, 27 Am. St. Rep. 517; *Baylis* v. *Baylis*, 207 N. Y. 446, 101 N. E. 176; *Rontey* v. *Rontey*, 101 Misc. Rep. 166, 166 N. Y. Supp. 818.

The case of *Irby* v. *Wilson, supra,* was practically overruled in *Bidwell* v. *Bidwell*, 139 N. C. 402, 52 S. E. 55, 2 L. R. A. (N. S.) 324, 111 Am. St. Rep. 797, where the court said: "Where the plaintiff only is domiciled in the State of the forum, and has obtained a decree of divorce for a cause recognized as valid in such State, after constructive service of process on the defendant, according to the course and practice of the court, there has heretofore been diversity of opinion as to the extent and binding force of such a decree in other jurisdictions. North Carolina has heretofore held against the validity of such a decree by the courts of other States as affecting the status of her own citizens. The better doctrine, however, *now* seems to be that where the domicile of the plaintiff has been acquired in good faith, and not in fraud or violation of some law of a former domicile, a divorce of this kind should be recognized as binding everywhere—certainly within the jurisdiction of the United States or any one of them."

The Pennsylvania cases cited were all decided before *Haddock* v. *Haddock*, and follow the Pennsylvania case referred to in *Reel* v. *Elder*, 62 Pa. St. 308, 1 Am. Rep. 414.

In *Parker* v. *Parker, supra,* the facts were different from the facts in the instant case. It involved a contest over property rights between two widows of the same man, and is not in point.

The New York cases follow the fixed policy of the New York State not to recognize the principles of comity in such cases.

[6] While a foreign divorce, based upon fraud, will not be recognized, as a matter of comity (*Corvin* v. *Commonwealth*, 131 Va. 649, 108 S. E. 651), when viewed in the light of authority, reason and Virginia's policy as to comity, the courts of this State should recognize the validity of the appellee's Nevada domicile and divorce.

The record discloses nothing to warrant a suggestion that Mrs. Humphreys procured her Nevada divorce by fraud. As appears from the record, her husband's conduct towards her had been such that to live with him longer meant the permanent impairment of her health, if not the loss of her mind.

[7] The *evidence* introduced in the trial of the Nevada case does not appear in the judgment roll filed with the answer of the defendant, but it sufficiently appears from the facts certified therein as proven that the testimony of Mrs. Humphreys in the Nevada case did not differ materially from her testimony in the instant case.

It is true that the appellant denies the charge of cruelty and that his testimony and that of some other witnesses tends to contradict her testimony in some respects. But it is also true that the testimony of some of the witnesses introduced on behalf of the appellant tends strongly to support the testimony of the appellee. Dr. R. S. Spillman, a witness called for the appellant, who was her attending physician and a social visitor in the home, had known Mr. and Mrs. Humphreys for over twenty years. In answer to the question, whether from his knowledge of the appellant and his wife, and taking the conditions as he found them, her condition could have been produced by nagging, discourteousness and domineering position and treatment on the part of the husband, answered: "That could do it, I think." He also testified that he knew of no other cause for her condition; and when asked, "Did you see anything in Mr.

Humphreys' conduct towards her which would justify you in thinking that was the case," replied: "Well, I would say it was probably partly. It would be one of the elements that would come into it."

Under such circumstances, she had the right to change her domicile.

[8] The Virginia statute (Code, section 5104) provides that "cruelty, reasonable apprehension of bodily hurt, abandonment or desertion, shall be a ground for divorce *a mensa.* The words "bodily hurt" as here used are not restricted to a physical assault upon the body, but include any course of conduct which leads to serious nervous or mental disease.

In *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, the court said: "According to the authorities, the cruelty that authorizes a divorce is anything that tends to bodily harm and thus renders cohabitation unsafe; or, as expressed in the older decisions, that involves danger of life, limb, or health. I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, which may as effectually endanger life or health as personal violence, and which, therefore, would afford grounds for relief by the court. But it is obvious that what merely wounds the feelings without being accompanied by bodily injury or actual menace—mere austerity of temper, petulance of manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten harm, although they be high offenses against morality in the married state, does not amount to legal cruelty."

In *Ringgold* v. *Ringgold*, 128 Va. 485, 104 S. E. 836,

12 A. L. R. 1383, the same principles were approved in the following language:   "The husband has never offered any physical abuse or violence, and the wife has not claimed to have ever had any reason to apprehend bodily hurt.   But violence and apprehension of bodily hurt, though nearly always appearing in suits for divorce on the ground of cruelty, are not indispensable ingredients of that offense.   The authorities generally, including those in our own State, wisely allow for exceptional cases in which there may be extreme cruelty without the slightest violence.   Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises, and may be visited upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce."

[9] In the opinion in *Steckel* v. *Steckel*, 118 Va. 198, 86 S. E. 833, the court quoted with approval Lile's Notes to 1 Minor, at page 69, as follows:   "She may establish a separate domicile wherever it is necessary and proper that she do so.   And the courts of either State may in such case determine the status of the party domiciled there, and such determination will be entitled to full faith and credit in every other State."

In *McGrew* v. *Mutual, etc., Co.* (1901), 132 Cal. 85, 64 Pac. 103, 84 Am. St. Rep. 20, the court said this: "The theoretical unity of husband and wife dissolves in the presence of a legal proceeding, the direct and only purpose of which is to destroy that unity.   This is admitted to be so where the wife brings suit for divorce; but the reason of the rule applies to her whether she be plaintiff or defendant."

In *Ranson* v. *Ranson*, 54 Misc. Rep. 410, 104 N. Y. Supp. 198, in which a divorce decree of a Virginia court was declared to be void in New York, it appears that

the wife left her husband, "on account of his habits," yet, on the question of the right of the wife to acquire a separate residence, the court said: "The first question is whether the Virginia court acquired jurisdiction of the action in divorce. As to the defendant herein (plaintiff in action), I am of the opinion that it did. While the domicile of the wife is for general purposes determined by that of the husband, she may, by leaving him for cause, acquire a residence in another State, by which she may maintain an action for divorce (14 Cyc. 584). I am satisfied that defendant herein did acquire a *bona fide* residence in Virginia, and that she had just cause for leaving her husband."

These parties were married in New York, and the wife, who came to Virginia, secured a divorce decree in a Virginia court on constructive service. The holding of the New York court recognizes the right of the wife to acquire a separate residence without the husband having given ground for divorce.

[10] It sufficiently appears from the record that Mrs. Humphreys went to Nevada in January, 1918, with the intention to acquire a *bona fide* residence in that State. She remained in Nevada until May, 1919, when she was compelled to return to Virginia to attend to some legal business. Having once acquired her residence in that State, she remained a resident thereof until her marriage in May, 1920. After her return from Nevada, a Nevada senator secured for her, as a citizen of his State, a position with the Government at Washington.

If it be admitted that Mrs. Humphreys went to Nevada for the purpose of obtaining a divorce, it does not follow that she could not acquire a *bona fide* residence there.

This subject was considered in *Wallace* v. *Wallace*, 65 N. J. Eq. 359, 54 Atl. 433, where the court said: "But

it was insisted by the learned vice-chancellor that in addition to the requirements of the statute as to residence as above defined, the residence cannot be acquired with the desire or intention to procure a divorce.    On page 519, 62 N. J. Eq., 50 Atl. 792 (*Wallace* v. *Wallace, supra*), he says:    'It has been my rule, and I believe that of the other members of the court, not to decree for divorce for desertion based upon a service out of the jurisdiction and a domicile not matrimonial, unless such domicile has been acquired under circumstances showing sufficient and controlling reasons for its acquisition, other than the desire to procure a divorce, and certainly never when the avowed object was to obtain that relief.'

[11] "The practical effect of this doctrine is to prevent a citizen who removes into this State from another, even though such removal be made *bona fide* with *animus manendi*, from acquiring a residence here sufficient to sustain an action for divorce, unless some reason for acquiring such residence be shown other than the desire to procure a divorce; its legal effect is to substitute for the public policy established by the legislature a judicial policy of contrary import.    I concur entirely in the principle laid down by the special master in this case that a person may legitimately move to another State in order to avail himself of the laws of that State, and this includes necessarily the right to remove into the jurisdiction of this State for the purpose of procuring a divorce, the only requirements being absolute good faith in the taking up of such residence and of the *animus manendi*.    In other words, the *factum* of residence and the *animus manendi* prove the domicile."

In *Gildersleeve* v. *Gildersleeve, supra*, the court (88 Conn. 694, 92 Atl. p. 686) said:    "(6) It is suggested that the South Dakota residence could not have been *bona fide* for the reason that the unmistakable indica-

tions from surrounding circumstances are that he was moved to go to that State as one in which he could obtain a divorce more speedily and readily than in this State, and for the purpose of obtaining one.    These considerations are indeed pertinent upon the question of the good faith character of the change of abode, and we must assume that they were weighed by the trial court in connection with the other testimony bearing upon that point.    But a motive and purpose such as indicated would not prevent the acquisition of a new domicile.

"Whatever the motive or purpose actuating a change of domicile may be, the tests to be applied in determining whether one had in fact taken place do not include them.    The sole considerations are:    (1) An actual change of residence; and (2) the absence of an intention to remove elsewhere.

" 'But if the *animus* really exists to remain there permanently, the fact that the motive of removal is to procure a divorce is immaterial.' "    Minor on Conflict of Laws, p. 199, sec. 90.

"There is no rule of law which prevents one from changing his domicile in order to facilitate his obtaining a divorce or to secure other advantages he may think that the laws of the new domicile may afford him.    He is free to change at his pleasure, but the change must be a *bona fide* one to be effective.    If actual and *bona fide*, the change will be accomplished.    *Fosdick* v. *Fosdick*, 15 R. I. 130, 23 Atl. 140; *Colburn* v. *Colburn*, 70 Mich. 647, 649, 38 N. W. 607; *Hegeman* v. *Fox*, 31 Barb. (N. Y.) 475, 479; *Albee* v. *Albee*, 141 Ill. 550, 563, 31 N. E. 153; *Gregory* v. *Gregory*, 76 Me. 535, 539.

" 'For the purposes of municipal law in the absence of statute, and always for the purposes of private international law, the period during which the party is domi-

ciled is immaterial.   He acquires a domicile at the moment when actual residence is accomplished by the *animus manendi*, and from that moment his status should be determined by the law of that country.'   Minor on Conflict of Laws, page 197, section 89."

Since the decision in the *Haddon Case,* foreign dedecrees of divorce, obtained without fraud, upon constructive service, where no statute or public policy would be violated thereby, have been generally recognized by the courts of other States, on the ground of comity.

To sustain his contention appellant relies on *Perkins v. Perkins* (1916), 225 Mass. 82, 113 N. E. 841, L. R. A. 1917-B 1028; *Sammons* v. *Pike* (1909), 108 Minn. 291, 120 N. W. 540, 122 N. W. 168, 23 L. R. A. (N. S.) 1254, 133 Am. St. Rep. 425; *Davis* v. *Davis* (1921), 70 Colo. 37, 197 Pac. 241.

These cases are distinguishable from the case at bar, and are not controlling here.

In Massachusetts there is a statute which provides that "if an inhabitant of this Commonwealth goes into another State or country to obtain a divorce for a cause which occurred here while the parties resided here, or for a cause which would not authorize a divorce by the laws of this Commonwealth, a divorce so obtained shall be of no force or effect in this Commonwealth."   We have no such statute in Virginia.   Besides, there was no actual notice to the nonresident defendant in the *Perkins Case, supra,* as was given in the instant case.   The decision refusing to recognize the foreign divorce in the *Perkins Case* was rested mainly upon the fact that the spouse, who left the matrimonial domicile, was guilty of a marital wrong, while the one who remained was innocent.   While it is contended that a similar condition ob-

tains in the instant case, we do not think the record sustains that contention.

In *Sammons* v. *Pike, supra,* the divorce which the Minnesota court refused to recognize was obtained in Dakota territory. Neither of the parties was a resident of that territory, and it does not clearly appear that the husband, who filed the suit and secured the divorce, was ever in the territory. Mrs. Strong actually and continuously resided in Nevada for one year and four months, eight months of this period having followed the obtaining by her of her decree of divorce. She was a resident of Nevada for two years and four months, from January, 1918, till her marriage in May, 1920.

In *Davis* v. *Davis, supra,* the court recognized the principles of comity, saying: "The basis of comity in these matters is the principle that we ought to give to the decrees of other States that force which we would wish them to give to ours."

The ground on which the court refused to recognize the decree was that the spouse obtaining the decree had, by fraud, prevented the spouse of the matrimonial domicile from receiving actual notice of the divorce proceeding. No State would desire that other States recognize its decrees under such circumstances.

[12] The fact that cruelty is a ground for an absolute divorce in Nevada, while in Virginia it is ground only for a divorce *a mensa,* which may later be converted into a divorce *a vinculo,* does not affect the application of the principles of comity in this case. Such a slight difference in the law of the two States is not a matter which can be said to so affect our public policy as to warrant us in refusing to recognize the judicial action of a sister State, if otherwise we are willing to do so. *Joyner* v. *Joyner,* 131 Ga. 217, 62 S. E. 182, 18 L. R. A.

(N. S.) 647, 127 Am. St. Rep. 220; *Gildersleeve* v. *Gildersleeve*, 88 Conn. 689, 92 Atl. 684, Ann. Cas. 1916-B, 920.

[13] In the *Gildersleeve Case, supra*, at page 387, the court said: "It is no light matter, as affecting individual, social, or civil interests and good morals, that through the attitude of the courts in refusing recognition of the judicial action of sister States, a condition should be created where legitimacy becomes dependent upon State lines, where wives in one State become concubines when they pass into another, where husband or wife living in lawful wedlock in one jurisdiction is converted into a bigamist by change of location, where persons capable of inheritance in one part of our country are incapable in another, where certainty of status may readily give place to uncertainty and property rights be thrown into confusion."

Such a condition of the law should not be permitted under the decisions of the courts to exist, except when to recognize the foreign divorce would be a violation of the morals or public policy of the State.

[14] The Nevada court having failed to get actual service of process on the appellant in the territorial limits of that court's jurisdiction, and he having declined to voluntarily appear, no valid personal judgment could be entered against him. *Pennoyer* v. *Neff,* 95 U. S. 714, 24 L. Ed. 565.

It sufficiently appearing that the Nevada court had full jurisdiction of the person of the plaintiff in the suit before it, and of the subject matter of that suit, and that the defendant therein was duly proceeded against by order of publication, and that in addition thereto a copy of the process and of the bill of complaint in that suit was, prior to the entry of the divorce decree therein, personally delivered to the defendant in that suit at his residence in Norfolk, Virginia; that the public policy of the State of Virginia does not prevent the recognition on

the ground of comity of the divorce granted by the Nevada court, but that its policy, as evidenced by its legislation, in respect to divorces granted by its own courts, favors the recognition, on the ground of comity, of the Nevada decree, we are of the opinion that the divorce granted by the Nevada court should be recognized by the courts of Virginia as a complete divorce from the bonds of matrimony between the defendant and the plaintiff, as of the date the same was entered; but that we should decline, for the reasons stated, to give effect to that portion of the said decree which allows alimony and counsel fees in favor of the plaintiff in the Nevada suit.

The decree complained of will be affirmed.

*Affirmed.*

BURKS, J., concurs in result.