# Richmond

## MARGARET FLINN HOWE v. ETHEL C. HOWE, EXECUTRIX, ETC.

January 19, 1942.

Record No. 2438.

Present, All the Justices.

The opinion states the case.

*Peyton, Beverley, Scott & Randolph* and *Victor S. Bryant* (Durham, N. C.), for the appellant.

*Tucker, Bronson, Satterfield & Mays,* for the appellee.

HOLT, J., delivered the opinion of the court.

In this cause we are to determine the validity of a foreign divorce obtained in circumstances to be noted.

On October 27, 1903, Dr. George Howe and Margaret Smyth Flinn were married in South Carolina. Soon thereafter they moved to and settled in Chapel Hill, North Carolina.

Dr. Howe taught Latin in the University of North Carolina and later became head of its Latin School. He was also Dean of the School of Liberal Arts and a member of the University's Advisory Committee. He was also a director in a local bank and in a building and loan association.

About 1910, Mrs. Howe visited her mother and was with her for about two years. She then went to New York to follow art, or some other fad, and was there for about thirteen years. During these periods there was no separation; her husband visited her on occasion, particularly during his summer vacations. She then returned to her Chapel Hill home and lived there with him until 1934 and has lived there without him since that time.

About the close of the academic year, 1934, Dr. Howe stated to a number of his friends that he was going to take a

vacation—"I am going on a little vacation." At other times he indicated that his purpose was to take a rest. He told his wife that his trip was to do some research work and to examine into the methods of western universities. He promised to write to her and, with no indication of any other purpose, left in his automobile on the 14th of June, 1934. He took with him two ordinary suitcases, a small box and clothing suitable for summer wear, and parted with her as might have been expected of one going on a vacation. He kissed her good-bye.

His first letter to her was from Asheville, North Carolina, then one from Nashville, and on June 24 he wrote telling her of his arrival at Little Rock. On July 1 he wrote sending her some money for household expenses and asked that bills for food, etc., be sent on to him. On July 4 he wrote again, sending her some money. Other letters followed of date July 10, 15, 22, 27 and August 2; and not until August 13 did he write telling her of the real object of his visit.

That letter, in part, reads:

"I hope you will be able to read this quietly and calmly and to see the truth and rightness of it.

"I have now been here a long enough period to satisfy the requirements of residence, and I am filing papers for divorce. * * *

"I am confident that after the first shock of action has passed and you will have thought it through as affecting both sides, you will find yourself happier than you have been for a long long time.

"In all kindness and with sincerest conviction and purpose.
George."

He reached Little Rock on June 24, went at once to see a lawyer, Mr. A. L. Barber, and was thereafter in constant conference with him. Suit was instituted on August 17 and final judgment entered on October 3. On the day of his conference with counsel, his letter to his wife has in it this disarming statement:

"I think on the whole I shall go no further than this, Little Rock, but I mean to do some exploring with this as a center.

I like it here and good roads lead out in various directions. St. Louis is not very far away nor New Orleans."

Mr. W. A. Boyd was appointed as a guardian ad litem. It is the duty of such an attorney, under Arkansas practice, to notify the defendant of the pendency of the suit, but he has no power to plead or enter an appearance. After receiving notice and after conference with her brother and other friends, including Mr. Douglas McKay, who was a friend both of herself and of Dr. Howe, she induced Mr. McKay to go to Little Rock, and that he did in the early part of September. His purpose was to talk over the situation with Dr. Howe to the end that some reconciliation might be effected. He went to see Mr. Frank E. Chowning, a lawyer there, and explained to him the purpose of his coming. He went also to see Mr. Barber, Dr. Howe's counsel, to whom he made plain the fact that he came not as an attorney but as a friend both of Dr. and Mrs. Howe. With Mr. Barber's approval, he sought out Dr. Howe, who said that a reconciliation was not possible and that he was going forward with his suit.

Mr. McKay told Mr. Chowning that Mrs. Howe was herself coming to Little Rock, and after his return Mrs. Howe did come and immediately got in touch with Mr. Chowning. At her suggestion there was a conference in his office at which were present Dr. Howe, Mr. Barber, Mr. Chowning and Mrs. Howe. She and Dr. Howe retired to a private room in the office suite and were there for quite awhile. They then came back into the room where their lawyers sat. Mrs. Howe was in tears and the Doctor was calm. She had been able to acomplish nothing, and the Doctor made clear his purpose to go forward with the suit.

Mrs. Howe never made any appearance in the Arkansas suit; service was by publication and not personal. Mr. Barber told Dr. Howe that the divorce when secured would be good, and Mr. Chowning assured Mrs. Howe that it would not be worth the paper that it would be written on.

Dr. Howe then came back to Chapel Hill on or about September 22 and resumed his professorial duties there—that

is to say, he left Little Rock before entry of any final decree, which was not entered until October 3. Upon reaching Chapel Hill he did not go back to his home but took up an abode elsewhere.

During the session of 1934-35, Dr. Howe continued to perform his academic duties. He continued as a member of the Advisory Committee and attended its meetings; he continued also to be a director in his bank and in his building and loan company and attended their meetings. In the autumn of 1934 he voted in a Chapel Hill election without reregistration. At the end of the academic year of 1935 Dr. Howe, due to failing health, was given a leave of absence with pay, and he left Chapel Hill on June 6. Before going he made arrangements under which one-third of his salary was to be turned over to Mrs. Howe. He spent that summer in Little Rock and came to Richmond in the autumn of that year. On October 11, 1935, he married Mrs. Ethel C. Eason, who had herself two days before obtained an Arkansas divorce through her lawyer, Mr. Barber. They were married and lived in Richmond until Dr. Howe's death on June 22, 1936. Dr. Howe died testate. In his will he gave all of his property "unconditionally to my beloved wife Ethel C. Howe" and directed that any preceding wills be cancelled. It bears date October 22, 1935, and was duly probated. The will superseding to which reference is made was executed on March 4, 1925; in it he gave unconditionally all of his property to "my beloved wife, Margaret Flinn Howe."

One would have to be incredibly credulous to believe that Dr. Howe went to Arkansas intending to establish a domicile there. For the purposes of citizenship he stood exactly as he would have stood had he gone to hunt bear in the canebrakes of that State. Moreover, he perpetrated a fraud upon the Little Rock court in representing to it that he was an Arkansan and planned to remain so for an indefinite time. And it must have been in the light of such a declared purpose that his counsel assured him that his divorce proceedings were regular and would stand; but as against this he had cautions given

to him before he left for Little Rock by a professor of law in his own University, supported by these authorities:

In *Harris* v. *Harris*, 115 N. C. 587, 20 S. E. 187, 44 Am. St. Rep. 471, it was held:

"A decree or divorce obtained by a wife, resident in another state, * * * without personal service of summons upon the husband, is a nullity in this state."

In *State* v. *Herron*, 175 N. C. 754, 94 S. E. 698, it was held that the Georgia divorce would not be recognized in North Carolina where it was obtained by a husband who, in the viewpoint of the North Carolina Supreme Court, had not obtained a bona fide residence in Georgia.

In *Pridgen* v. *Pridgen*, 203 N. C. 533, 166 S. E. 591, the court said:

"Between void and voidable marriages the law recognizes a distinction which applies to the status of the parties before the marriage relation is dissolved. A voidable marriage is valid for all civil purposes until annulled by a competent tribunal in a direct proceeding, but a void marriage is a nullity and may be impeached at any time."

Each State has exclusive control of the matrimonial status of those domiciled within its borders. It is perfectly plain that an Arkansas court could not divorce a couple residing in North Carolina, and it is equally plain that it would have no jurisdiction to disturb that status upon the prayer of a petitioner, who, for any cause, has come temporarily to rest within its borders.

Before Dr. Howe could be heard, he must have at least acquired an Arkansas domicile. Otherwise he had such rights as had a sojourner at the Hot Springs taking hot baths for arthritis, and no more.

Residence, or domicile, as used in statutes dealing in divorce, contemplates intention to live in the adopted home permanently or certainly for an indefinite period.

"Abiding in one place for a definite time, until the accomplishment of a certain purpose, unaccompanied by any intention to remain permanently or indefinitely, is not suffi-

cient to give a person a statutory residence." 17 Am. Jur. 297; Ann. 106 A. L. R. 15.

To acquire a new domicile one must abide there with intention to make it his permanent home or at least his home for an indefinite period. *Pendleton* v. *Commonwealth*, 110 Va. 229, 65 S. E. 536.

Many other Virginia authorities to the same effect might be cited.

Statutes usually fix a time during which petitioner must have been domiciled, but it is not necessary that they do so. In any event, the intention to make the adopted home a permanent home must appear. Time is not of the essence; intention is.

When named, statutory requirements for domiciliary residence are jurisdictional. 27 C. J. S. 643; *Chandler* v. *Chandler*, 132 Va. 418, 112 S. E. 856. In Virginia a year is necessary; in North Carolina a year also, and in Arkansas, two months. But until permanent residence has been actually and in good faith held for these several periods, these courts are without jurisdiction.

It is perfectly true that those who attack a judgment must sustain their assaults, but that burden in this case has been borne beyond peradventure.

By standards named, Dr. Howe was never residentially domiciled in Arkansas. He went to that State for one purpose and for one purpose only. When that was accomplished, he returned to North Carolina to continue professorial duties in the University at Chapel Hill; from its payroll he had never been divorced. And, as we have seen, he continued to discharge his duties as director in his bank and in his building and loan company. He voted without reregistration in the autumn of his return, and certainly he knew, intelligent as he was, that an Arkansan had no right to vote in North Carolina.

Since the Arkansas court was without jurisdiction, its decree is void. We have said that when a decree is defined as void, we have exhausted the descriptive possibilities of English language.

In *Snead* v. *Atkinson*, 121 Va. 182, 92 S. E. 835, Judge Prentis, to support a conclusion there reached, cites this statement from Freeman on Judgments, section 117:

■ "If it be null, no action on the part of the plaintiff, no inaction upon the part of the defendant, no resulting equity in the hands of third persons, can invest it with any of the elements of power or vitality." It has been a long time since life was breathed into a dead body.

The problem which confronts our court is well stated in this article to be found in 22 Va. Law Review 233:

"Even those favoring much greater liberality in divorce laws cannot fail to deplore the uncertainties of status created by the prevalence of migratory divorce decrees. To them it is a disgusting spectacle to see courts of 'justice' doing lip service to the doctrine of the sovereign and exclusive jurisdiction of the domicile state over the status of its own citizens, while encouraging and winking at the necessary perjury involved in the 'proof of jurisdiction' in the commercially minded 'divorce mill'. It is shocking to lovers of logic and consistency in the law to find courts of the domicile of migratory divorce seekers feeling increasingly driven by the 'equities' of the case to develop a rationale of evasion by invoking the logically inapplicable doctrines of estoppel, laches, etc., to confer a quasi-validity upon what is in essence an impertinent pronouncement by a court which knows it has no jurisdiction over the subject matter of the suit. On the other hand are those, who, although cognizant of the legal inconsistency involved in giving validity to an otherwise void decree, are driven by those same 'equities' to desire a temperance of the rigid rules of law in protecting the rights of innocent third parties by the application of rules of procedure which preclude the issue of the recognition of the 'Reno divorce'."

In the instant case there are no innocent parties; there are no children of either marriage; and Mrs. Eason knew everything that anybody knew about the manner in which Dr. Howe had secured his divorce.

Plainly jurisdiction is essential.

" \* \* \* a decree of divorce by a court not having jurisdiction of both parties and of the subject matter does not come within the full faith and credit clause of the federal constitution, and is entitled to no recognition whatever in the courts of another state or country, it being invalid, void, and without legal consequences. It is not rendered valid by a subsequent attempt by one of the parties to marry a third person by ceremony or contract." 27 C. J. S. 1289 (sec. 331). See also *Smith* v. *Foto,* 285 Mich. 361, 280 N. W. 790, 120 A. L. R. 801 and note; *Holt* v. *Holt,* 77 F. (2d) 538, and *Andrews* v. *Andrews,* 188 U. S. 14, 23 S. Ct. 237, 47 L. Ed. 366.

And so again we reach the conclusion that this Arkansas decree, with the exception of Arkansas, is void. What the courts of that State would do with it were all the facts before them we do not know.

*Haddock* v. *Haddock,* 201 U. S. 562, 26 S. Ct. 525, 50 L. Ed. 867, is a leading case on this subject. A married couple lived in New York. The husband deserted the wife and moved to Connecticut, became domiciled there and lived there for many years, after which he secured a divorce, supported by service not personal but by publication. This divorce the Supreme Court refused to recognize but said that under the doctrine of comity it might be accepted in New York or elsewhere. It differs from this in judgment in that Haddock was domiciled in Connecticut and long a resident. In this case Howe spent a part of his summer vacation in Arkansas and was never domiciled there. The application of the doctrine of comity we shall consider later.

Virginia cases have dealt with this subject and to some extent indicate the attitude of this court.

An early case, *Corvin* v. *Commonwealth,* 131 Va. 649, 108 S. E. 651, 39 A. L. R. 592, decided in 1921, grew out of this state of facts:

Corvin, a married man, was resident and domiciled in Wythe county, Virginia, and lived there with his wife until he became enamored of his sister-in-law. This infatuation developed into a criminal intimacy, and coupled with Cor-

vin's ill-treatment of his wife, forced her to leave him and seek refuge with a relative. He besought the wife to divorce him, but in vain, and he then ceased to contribute to her support and was tried and convicted of non-support in Wythe county. He left his home, went to the City of Washington for a short time, and proceeded thence to West Virginia, where he secured work as a farm laborer, and where his lady-love joined him. After remaining in West Virginia shortly more than a year he there instituted suit for divorce against his wife, serving her by publication, and alleging, falsely, that more than three years previously she had deserted him without cause. He testified in support of those allegations, was awarded a decree, married the other woman, and with her returned to Wythe county, Virginia, where he was promptly arrested and indicted for bigamy.

In his defense he vouched the decree of divorce granted him by the Circuit Court of Barbour county, West Virginia, and insisted that it was entitled to full recognition both by the rules of comity and under the full faith and credit clause of the Federal Constitution. This contention was denied and he was convicted of bigamy. The invalidity of the West Virginia divorce was held to have been established on two grounds, viz: first that no *bona fide* domicile in West Virginia had in fact been established, it appearing that his sojourn in that State was merely to obtain a divorce, with the initial intention of leaving as soon as he got it; and second, that he committed a fraud on the West Virginia court by offering false testimony to obtain his divorce.

In this case it was said:

" * * * It may be said that if the accused did not go to West Virginia with the determination to make it his legal domicile, or if he went there merely for the purpose of obtaining a divorce, intending to remain no longer than was necessary to accomplish his purpose, or if the divorce was obtained by fraud, the decree of the West Virginia court is void * * *."

The court then proceeded to comment upon the situation in this wise:

"There is much here, then, in his conduct to justify the conclusion that he had no other reason for going to West Virginia than the securing of the divorce there, which he could not obtain here, and that he always intended to return to Virginia. His mother had property in Wythe county, Virginia, and had frequently urged him to return, and he had neither property interest in West Virginia nor any prospective property interest there such as he had in Virginia."

In the case of *Humphreys* v. *Strong*, 139 Va. 146, 123 S. E. 554, decided in 1924, these facts appear:

The wife, after a rather turbulent and unhappy married life in Norfolk, Virginia, and some time after the parties had separated, proceeded to Reno. Some six months later she instituted there a suit for divorce on the ground of cruelty, serving her husband by publication; and a decree was granted. Soon after her arrival in Reno she entered a business college there and worked there for nearly a year in a department store; and she registered there as a voter and actually voted in several elections. After she had been in Reno for some seventeen months she visited the East to settle her affairs there, intending to return to Reno; but her return was prevented because of business and litigation. About two years after the Reno decree had been granted the husband obtained personal service on the wife in Virginia and there sued her for divorce, alleging the invalidity of the Nevada decree.

The opinion there holds (1) that there had been cruelty by the husband toward the wife; (2) that this cruelty justified her in changing her domicile; and (3) that she did, *bona fide*, change her domicile from Virginia to Nevada, intending to remain there permanently.

Since the wife was driven from the home, she had the right to go to Nevada, or to any other State, and establish a domicile there. A decree obtained in the State of her adopted domicile in the absence of fraud is entitled to recognition under the full faith and credit clause of the Federal Constitution. There was no occasion to introduce the doctrine of comity. The attack on the Nevada decree did not fail

because it came too late but because no attack upon it would ever have prevailed.

*Dry* v. *Rice*, 147 Va. 331, 137 S. E. 473, was decided in 1927. There a couple was domiciled in Virginia. The wife went to Reno, filed suit for divorce, served her husband by constructive process only and was awarded a decree. She then returned to Virginia, remained here for a year, then went back to Nevada, and thence to California. About two years after the entry of the decree she married another man. The husband, in a suit brought for that purpose, attempted to invalidate the Nevada decree. The court approved the rule laid down in *Corvin* v. *Commonwealth, supra,* and said that if the wife never acquired a domicile in Nevada and if she obtained a divorce there through misrepresentations and fraud, then her divorce "is not binding upon the courts of this State and may be treated as void." The court then went on to say where the burden of proof lay but refused to discuss the evidence and declined to invalidate the Nevada decree upon the ground that the husband was guilty of laches and said that "the rule which requires a defaulted party to act promptly for the protection of his rights is peculiarly applicable to suits for divorce," etc.

Our next case is *Wright* v. *Wright*, 164 Va. 245, 178 S. E. 884, decided in 1935. The wife left the husband in 1927. In 1927 he went to Reno and instituted suit for divorce but abandoned it before final decree. In 1930 he brought another suit in Richmond, Virginia, but dismissed it without prejudice. In 1931 he went back to Reno and brought another suit with constructive service. He was awarded a decree and remarried in 1932. Afterwards the wife brought a suit for non-support in the domestic relations court. That court upheld the husband's Nevada domicile. There was an appeal to this court; relief was denied on the ground that the matter was *res adjudicata*.

After reviewing these cases, the author of that article in 22 Law Review, *supra,* thus fairly summarizes the situation in Virginia:

"It seems that the Court of Appeals of Virginia, in line

with the vast majority of other State courts, refused to establish any precedent with regard to its recognition of Reno divorces. It, of course, does not deny that a decree of divorce granted by a court without jurisdiction is a nullity and has no extraterritorial effect, but prevents the real issue from coming before the court by acting within its discretion with regard to sufficiency of evidence, conduct of the parties and protection of interest of innocent persons. However, in a proper case the court will not hesitate to deny recognition of a void decree."

In the instant case, the evidence leaves us in no doubt of the facts; indeed, they are hardly in dispute. Since Dr. Howe was never domiciled in Arkansas, its courts were without jurisdiction. Is this a proper case in which to apply the doctrine of comity? We think not.

Just when marriage to Mrs. Eason began to germinate in Dr. Howe's mind we can not tell. She and Dr. Howe, within the bounds of convention, had long been intimate. He met her in Memphis and drove her to Little Rock. He introduced her to Mr. Barber and remained in daily touch with her during their stay in that city. As soon as it was possible he drove her to Richmond, where they were married immediately upon information that her decree had become final. Plainly she went to Little Rock with two purposes in her mind—one was to obtain a divorce as soon as possible and the next was to marry Dr. Howe with all convenient speed. She knew all about Dr. Howe's divorce that anybody could know, and Dr. Howe took her to Little Rock for purposes plainly apparent. Neither of these parties occupies a position which has any appeal to a court of equity.

Some deference should be paid to the laws of North Carolina. Dr. Howe and his wife were domiciled there before the date of the divorce, and they were domiciled there for a year after its date. The decree in that State was entitled to no sort of recognition. This Dr. Howe knew, and so they came to Virginia in the hope that it might receive more sympathetic consideration.

"An element which has been considered and given great

weight against the recognition of a foreign divorce decree under the rules of comity is the fact that the plaintiff went to the state or country in which the decree was rendered merely for the purpose of obtaining the decree, intending to remain no longer than was necessary to accomplish his purpose." 17 Am. Jur. 566, citing among other cases *Corvin* v. *Commonwealth, supra.*

Courts should be slow to countenance this unseemly competition between States for an unsavory business; certainly where the rights of no innocent parties are involved.

The doctrine of laches should not be applied and for a number of reasons.

Since the Arkansas decree was void, Mrs. Howe could have utterly disregarded it, as something non-existent. It would be no more logical to have some statute declare that after a stated time had passed no attack should be made upon this stillborn judgment. Time touches defective decrees but in passing can give no vital force to those which, in legal contemplation, might as well never have been written. An attempt to apply either laches or limitations to this decree would be an attempt to apply them to something which was not there—to give substance to a ghost.

Again Mrs. Howe was deeply distressed at her husband's attitude and sought in tears in Little Rock to dissuade him from his purpose and to effect a reconciliation. She still was anxious to bring that about. Dr. Howe, after his return to Chapel Hill, continued to pay a gardener to look after the home place. He contributed in some measure at least to its maintenance; he took his wife to a hospital in Chapel Hill, and, without protest, heard her spoken of as his wife. Failing in this, futile attempts were made to effect some permanent financial adjustment of their affairs and for her support. Later he did turn over to her one-third of his salary.

The Arkansas decree was void in North Carolina, where husband and wife resided. She was still his wife. It continued to be his duty to support her. All she received from him she had the right to demand. That right was not defeated because they were separated, and so no principle of laches or

estoppel can apply. *Heflin v. Heflin*, 177 Va. 385, 14 S. E. (2d) 317. Moreover, had she brought suit, his contributions, for a time at least, would probably have ceased.

In conclusion it is said that Dr. Howe's health was broken by domestic conditions. The courts of North Carolina stood ready to give him every proper relief warranted by the laws of North Carolina. He was domiciled there. The inference is that he believed the Arkansas courts would give him relief not warranted by North Carolina law. If this be not true, then his purpose must have been to mislead his wife until he could confront her with a *fait accompli.*

Should the Chapel Hill home or the proceeds of its sale be brought into hotchpot? We know of no rule of law which requires it. A husband has a right to give property to his wife.

In the consideration of this cause we take occasion to acknowledge our indebtedness to William G. Maupin, Esquire, of the Norfolk Bar, who, in an address to the Norfolk and Portsmouth Bar Association of date June 9, 1941, lucidly and ably dealt with the status of these foreign divorces. He said that the proposition before us had not been squarely met. Probably not; its nearest approach is the *Corvin Case.* We meet it now.

The decree appealed from should be reversed and this cause remanded to the end that there may be an adjustment of the rights of the parties.

*Reversed and remanded.*

Browning, J., dissenting.