# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

COMMONWEALTH OF VIRGINIA V. HELEN M. B. RUTHERFOORD.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*W. W. Martin,* for the Commonwealth.

*John S. Barbour* and *G. Thomas Dunlop,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The Commonwealth of Virginia, under the appropriate statute for such proceedings, assessed Mrs. Rutherfoord on her income and intangible personal property for taxes for the years 1928, 1929 and 1930, in the sum of $18,336.63. If she were legally assessable the amount is concededly correct.

She instituted proceedings under the applicable section of the Code of Virginia praying for relief from the assessments which she alleged were without warrant of law under the statutes of Virginia and under the Constitution of the United States, and that, if the attempt to subject her to the burden of the tax was within the contemplation of the statutes of Virginia, then the enforcement of their provisions would be in violation of her rights as a citizen of the State of New York and the United States, and would deprive her of her property in derogation of the Fourteenth and Nineteenth Amendments of the Constitution of the United States.

The court below granted the prayer of the petition and declared the assessment void and exonerated the petitioner from payment of the tax.

The Commonwealth made the assessments upon the theory that Mrs. Rutherfoord was, at the time they were made, domiciled in Virginia for the purpose of taxation and for every other purpose, except that of voting.

The facts appear to be clearly and succinctly stated in the "Stipulation of Facts," appearing in the record, and therefore we quote them:

"Helen M. B. Rutherfoord, the applicant, hereinafter refered to as Mrs. Rutherfoord, is the wife of John Rutherfoord, hereinafter referred to as Judge Rutherfoord, to whom she was married in New Rochelle, New York, on the 19th day of July, 1927. She was born Helen Mason, in Philadelphia, Pennsylvania, and resided there and in Washington, D. C., until February 14, 1922, when she was married to John George Beresford, a citizen of the State of New York, residing at New Rochelle, county of Westchester, New York. Mr. Beresford died on the 25th day of May, 1925, leaving to her by his will a considerable estate which was partially invested in securities.

"During Mrs. Rutherfoord's marriage to Mr. Beresford she acquired and still owns certain improved real estate in Washington, D. C., consisting of a dwelling house known as 1602 Twentieth street which was during her marriage to

Mr. Beresford and still is occupied by her during a portion of each year. At the time of her marriage to Mr. Beresford she took up her residence and domicile with him at New Rochelle, State of New York, where he owned and occupied a dwelling house and in which they resided as their home. During Mrs. Rutherfoord's marriage to Mr. Beresford both he and she paid State income and other taxes as citizens and residents of the State of New York, always claiming their domicile in that State. Upon the death of Mr. Beresford she continued to reside in New Rochelle, New York, in the house she acquired by devise from her husband, and continued to maintain her domicile there and continued to pay income taxes and other taxes properly assessable against her by the State of New York as a citizen and resident of that State.

"On the 19th day of July, 1927, Mrs. Rutherfoord was married to Judge Rutherfoord at her home in New Rochelle, New York, and Mrs. Rutherfoord and Judge Rutherfoord have lived together amicably as husband and wife since that time.

"Prior to Mrs. Rutherfoord's marriage to Judge Rutherfoord she had discussed with him the question of her domicile after their marriage and whether by such marriage she would lose her status as a citizen of the State of New York. Judge Rutherfoord, as well as her attorney, had told her that in their opinion she would be free to maintain her separate domicile wherever she chose. Judge Rutherfoord also told her that he was perfectly willing that she should maintain her domicile in New York State and that in any event he intended to abandon his domicile in Virginia.

"At the time of his marriage to Mrs. Rutherfoord Judge Rutherfoord was a citizen of and domiciled in the city of Richmond, State of Virginia. Immediately prior to his marriage he closed his law office in Richmond, sold his law library to C. M. Chichester and resigned his membership in the Westmoreland Club of Richmond where he had been a resident member. In November, 1927, he was elected to

resident membership in the Metropolitan Club of Washington, D. C. Subsequently Judge Rutherfoord transferred his voting place to Mathews county, Virginia, as hereinafter stated, and took a nonresident membership in the Westmoreland Club of Richmond.

"After his marriage and during the remainder of the year 1927 and the greater part of the year 1928 Judge Rutherfoord was absent from the State of Virginia and had no physical place of abode of any kind there, having given up his rooms in Richmond in June, 1927. Since his marriage Judge Rutherfoord has had no physical place of abode anywhere other than the several places of abode owned by Mrs. Rutherfoord.

"On November 6, 1928, at the general election held in that month Judge Rutherfoord exercised the right of franchise as a registered voter in Lee ward, Richmond, Virginia; subsequently, in February, 1929, he transferred his voting place from Lee ward, Richmond, Virginia, to Battery precinct, Westville district, Mathews county, Virginia, by proceedings as provided by section 100 of the Code of Virginia, and voted in the said Battery precinct at the Democratic primary held on August 6, 1929.

"Judge Rutherfoord has filed as a legal resident of Virginia in 1927, 1928, 1929 and 1930 his State tax returns of income and intangible property, has paid the taxes assessed upon such returns and has also for the said years paid his State capitation tax as a resident of Virginia. Copies of said tax returns are attached hereto and made a part hereof and are designated as Commonwealth G, H, I and J respectively.

"During the spring of 1928 Mrs. Rutherfoord purchased an old place called 'Green Plains' in Mathews county, Virginia, and Judge Rutherfoord and Mrs. Rutherfoord subsequent to that time have occupied Green Plains at intervals, but in no year have they occupied it for as much as four months.

"Subsequent to her marriage to Judge Rutherfoord Mrs.

Rutherfoord had spent a portion of her time each year in Washington, D. C., occupying the house which she owns at 1602 Twentieth street, northwest, and a portion of the time each year at her residence at New Rochelle, New York, and a portion of the time during the years 1928, 1929 and 1930 at Green Plains in Mathews county, Virginia. Her residence at New Rochelle, New York, has never been closed since her marriage to Judge Rutherfoord and ever since establishing her domicile in New York in 1922 she has continued to pay as a resident all taxes properly assessable against her by the State of New York and the political subdivision thereof, including income taxes and taxes on her real estate and tangible personal property. Her income tax returns have been continuously filed in New York State as a resident of that State, including income tax returns filed in 1926, 1927, 1928, 1929 and 1930. Mrs. Rutherfoord paid income tax to the State of New York in the amount of $1,161.71 on her income for the calendar year 1927, and on her income for the calendar year 1928 she paid to the State of New York income tax in the amount of $895.82, and on her income for the calendar year 1929 she paid to the State of New York tax in the sum of $1,116.37.

"Mrs. Rutherfoord did not in the years 1927, 1928, 1929 and 1930, or any of them pay to the State of New York, or any political subdivison thereof, taxes on any intangible personal property owned by her for the reason that such intangible personal property was not assessable with property taxes under the laws of the State of New York or of the political subdivision of which the town of New Rochelle constitutes a part.

"Mrs. Rutherfoord is still a registered voter in the State of New York and has never voluntarily or knowingly changed her status with respect to her domicile in that State, and has not now and never has had any intention or desire to establish her domicile in the State of Virginia. It is now and has been since 1922 her intention and desire

to continue to be a citizen of and domiciled in the State of New York.

"On January 7, 1931, Helen M. B. Rutherfoord was assessed by the Department of Taxation of the Commonwealth of Virginia with State income taxes and taxes on intangible personal property owned by her for the tax assessment years 1928, 1929 and 1930, based upon detailed information furnished voluntarily to the Department of Taxation by the attorneys for Mrs. Rutherfoord, but without waiver of any of her rights or of her protest hereinafter mentioned after said department had requested such information and after she had declined and protested its right to require the same or to base any assessment against her thereon, in order merely to facilitate a judicial determination of all questions involved. Copies of said assessments are attached hereto and made a part hereof and are designated as Commonwealth A, B, C, D, E and F. In assessing State income taxes the Department of Taxation has in pursuance of section 39 of the Tax Code of Virginia (Acts 1928, ch. 45) deducted from the amount of income tax which would have otherwise been assessable in Virginia the full amount of all income taxes paid by Mrs. Rutherfoord to the State of New York. It is agreed that if under the law Mrs. Rutherfoord is assessable by the Commonwealth of Virginia with State income tax and tax on intangible personal property that the said assessments of taxes made by the Department of Taxation are correctly computed upon the correct values."

It is the contention of the Commonwealth that in Virginia, at common law, and by statute, the domicile of a wife, living amicably with her husband, is controlled by the domicile of her husband.

The one question for determination in this case is—Can a married woman, living with her husband on amicable terms, have a separate domicile from his?

The Commonwealth says that she cannot and predicates its contention upon the common-law fiction that the entity

or being of the wife is merged in that of the husband; that the relation genders unity; that they are one and that one is the husband.

Its contention, in short, is that Judge Rutherfoord's domicile, during the years constituting the period embraced by the tax assessment, was in Virginia and *ergo* that of Mrs. Rutherfoord, his wife, was in this State and it must be so taken for all purposes except that of voting, and this sole exception is because of statutory enactment.

The arguments in this case have taken a wide range through the ramifications of the principles of common law and statute and constitutional law and their development and change. They are interesting and informative but to discuss them with care would so extend our inquiry as to make this opinion tedious and prolix and, indeed, we do not think it essential to the decision.

Counsel for Mrs. Rutherfoord urge that the common-law rule of the merging of the wife's legal identity into that of the husband, for most practical purposes, no longer obtains. That it has been rendered nugatory by statutory provisions and by the evolution of things and of time and that nowhere is the change more notable and complete than in Virginia.

Let us see what the legislature of this State has done toward the emancipation of married women from the inhibitions of the common-law doctrine.

Section 5134 of the Code, relating to the property rights of married women, provides as follows: "A married woman shall have the right to acquire, hold, use, control, and dispose of property, as if she were unmarried, and such power of use, control, and disposition shall apply to all property of a married woman which has been acquired by her since April fourth, eighteen hundred and seventy-seven, or shall be hereafter acquired; provided, however, that her husband shall be entitled to curtesy in her real estate other than her equitable separate estate when the common-law requisites therefor exist, and he shall not be deprived thereof by her sole act; but neither his right to curtesy nor his marital

rights shall entitle him to the possession or use, or to the rents, issues, and profits of said real estate during the coverture; nor shall the property of the wife be subject to the debts or liabilities of the husband. A married woman may contract and be contracted with, sue and be sued, in the same manner and with the same consequences as if she were unmarried, whether the right or liability asserted by or against her shall have accrued heretofore or hereafter. In an action by a married woman to recover for a personal injury inflicted on her, she may recover the entire damage sustained, notwithstanding the husband may be entitled to the benefit of her services about domestic affairs; and no action for such services shall be maintained by the husband. A husband shall not be responsible for any contract, liability, or tort of his wife, whether the contract or liability was incurred or the tort was committed before or after marriage. (1899-00, page 1240.)"

Section 82-a of the Virginia Code of 1930 (chapter 269, Acts of 1922), provides in part: "* * * For the purpose of registering and voting, the residence of a married woman shall not be controlled by the residence or domicile of her husband."· · ·

! Section 5134 and the similar section 2286-a, Code of 1904, have been construed by this court. In the case of *Moreland* v. *Moreland,* 108 Va. 93, 60 S. E. 730, 734, it was said: "Since the legislatures of various States have enacted laws whereby the wife is given the rights and powers of a *feme sole,* almost as completely as if she were unmarried, being given the unqualified right 'to contract and be contracted with, sue and be sued, in the same manner and with the same consequences as if she were unmarried'; the statute of no State having gone farther with respect to the rights, etc., of a married woman than our own (section 2286-a, Virginia Code 1904), it is now not essential to the validity of such a contract as we have before us that the provision for the wife be made through the intervention of a trustee."

In the case of *Edmonds* v. *Edmonds,* 139 Va. 652, 124 S.

E. 415, 416, this court, in speaking of the effect of section 5134, said: "Indeed, it has now wiped aside every vestige of control the husband ever had under the common law, and all his rights as husband except as to curtesy."

And again on page 658 of 139 Va., 124 S. E. 415, 416, it is said: "The effect of this statute is to give the wife as full control over her property during the coverture, as her husband has over his. She may sue her husband as if he were a stranger. *Pannill* v. *Coles,* 81 Va. 380; *Moreland* v. *Moreland, supra; DeBaun* v. *DeBaun,* 119 Va. 85, 89 S. E. 239; *Alexander* v. *Alexander,* 85 Va. 353, 7 S. E. 335, 1 L. R. A. 125. The revisors of the Code of 1919, when they came to deal with section 5134, in order that there might, thereafter, be no doubt of the total abolition of the husband's common-law rights, added immediately after 'but neither his right to curtesy,' the following significant words, 'nor his marital rights,' to language which of itself seemed to have eliminated the husband's previous rights. The language 'nor his marital rights' would seem but to emphasize and clarify, to make certain, the first few lines of the act: 'A married woman shall have the right to acquire, hold, use, control, and dispose of property *as if she were unmarried,'* etc. It follows that a husband in Virginia may be a trespasser upon his wife's lands whenever she is not occupying them, if he goes there against her will or her commands; that she may prosecute him for criminal trespass; that she may dispossess him if he is in possession; or may hold him to account in connection with any transaction with reference to her lands, as if he were a stranger. His right to curtesy and his marital rights give him no more power or authority over his wife's property than if he were a total stranger."

The manifest effect of section 82-a of the Code quoted above is to give the wife the right to select her residence for the purpose of registering and voting uncontrolled by the residence or domicile of her husband.

This, in effect, is another statutory invasion of the common-law fiction of the unity of husband and wife. It is

another incident of her emancipation from the bondage of the common law and a recognition of her status as that of one who is *sui juris*.

It will be noted that Mrs. Rutherfoord was born in Philadelphia and resided there and in Washington, D. C., until 1922, when she married Mr. George Beresford who was a citizen of the State of New York, residing at New Rochelle. He died in 1925, leaving her a considerable estate which was partially invested in securities. During the marriage she acquired a dwelling house in Washington, D. C., which she has occupied at intervals. At the time of her marriage to Mr. Beresford she made her residence and domicile with him at New Rochelle. This domicile she has never abandoned or changed, unless the mere fact of her marriage to Judge John Rutherfoord, in 1927, had that effect under the common-law fiction or theory adverted to. She stoutly maintains that her domicile is where it has been since 1922; that it is where she has chosen it and where she wishes it to be, and where it actually is. As *indicia* of this the "stipulation of facts" shows that she has and does exercise her right of franchise in New York; that as a citizen of that State she pays all taxes assessable against her there, including income taxes and taxes on her real estate and tangible personal property. Her income taxes for the three years following her marriage to Judge Rutherfoord amounted to $3,173.90. She did not pay any property tax on her intangible property for the years in question because such property is not assessable with property taxes in the State of New York. Before her marriage to Judge Rutherfoord she discussed with him and with her attorney the possible effect of such marriage upon her status as a citizen of the State of New York and was advised by them that she would be free to maintain her domicile as she might elect. Judge Rutherfoord assured her that he was perfectly willing that she should continue to maintain her domicile in the State of New York. It is proper here to say that in 1928 Mrs. Rutherfoord acquired by purchase a place in Mathews

county, Virginia, and that she and her husband spent a portion of the years referred to at each of the places of New York, Washington and Virginia, but in no year did they occupy the Virginia place for as long as four months. Judge Rutherfoord appears to have exercised his political rights and discharged his civic duties in relation to filing income tax reports and the payment of taxes, for these years, in Virginia.

Now with the facts clearly before us and with the pronouncement of this court that our statutes have "wiped aside every vestige of control the husband ever had under the common law and all his rights as husband except as to curtesy" and that, "in order that there might, thereafter, be no doubt of the total abolition of the husband's common-law rights, etc.," can we hold that the common-law fiction obtains in this case to the extent of trammeling the wife with a domicile, undesired by herself or her husband, and thereby fastening upon her a personal manacle which can but seriously affect her property rights. If the total abolition of the husband's common-law rights has been accomplished and every vestige of his control over his wife or her property has been wiped away by our statute, except that of curtesy, would it not be anomalous and illogical to say, that a mere incident of his being, a static element of his existence, growing out of the effect given to a relation by a rule, or fiction, or theory, of something that has, itself, passed away with the things that were, when applied to her political, civil and property rights, should influence or affect such rights to any practical or material degree?

Much of the judicial expression about the common-law theory of oneness of domicile and that the husband's, refers to it as a presumption. In this view, if the presumption is rebuttable, and we think it now is, then the evidence in this case establishes Mrs. Rutherfoord's domicile in the State of New York, in fact, whatever may be said about the domicile of Judge Rutherfoord. In 19 Corpus Juris, page

416, section 33, it is said: "But the domicile of the husband is at least *prima facie* the domicile of the wife."

The Supreme Court of North Carolina in *Irby* v. *Wilson,* 21 N. C. (1 Dev. & B. Eq.) 568, in speaking of the fiction, said: "But it is a mere fiction, which is never allowed, even in the common law, to obscure, much less defeat, justice."

The authorities are not uniform, they are diverse, but we think that the statutory invasion of the fiction, certainly in this State, has broken it down as far as the political, civil and property rights of the wife are involved, but as to purely domestic relations it is, at least in part, preserved and it ought so to be. In these practical and material things fiction must give way to fact; substance, not shadow, must prevail.

The following cases are apposite and illuminative of the issue presented, though their facts differ from those in the present. The general principle announced is applicable.

In *Shute* v. *Sargent* (1892) 67 N. H. 305, 36 Atl. 282, the husband and wife were domiciled in Massachusetts. The husband abandoned her without cause. She removed to New Hampshire. When she died she was domiciled in New Hampshire provided she could have a separate domicile from that of her husband. In deciding the question in the affirmative the court said: "The maxim that the domicile of the wife follows that of her husband 'results from the general principle that a person who is under the power and authority of another possesses no right to choose a domicile.' Story, Confl. Laws, s. 46. 'By marriage, husband and wife become one person in law,—that is, the very being or legal existence of the wife is suspended during the marriage, or at least is incorporated and consolidated into that of the husband, under whose wing, protection, and cover she performs everything.' 1 Bl. Com. 442. Such being the common-law status of the wife, her domicile necessarily followed her husband's, and the maxim applied without limitation or qualification.

"But the common-law theory of marriage has largely ceased to obtain everywhere, and especially in this State, where the law has long recognized the wife as having a separate existence, separate rights, and separate interests. In respect to the duties and obligations which arise from the contract of marriage and constitute its object, husband and wife are still, and must continue to be, a legal unit, but so completely has the ancient unity become dissevered and the theory of the wife's servitude superseded by the theory of equality which has been established by the legislation and adjudications of the last half century, that she now stands, almost without an exception, upon an equality with the husband as to property, torts, contracts, and civil rights. Pub. Sts., c. 176; *Ib.*, c. 90, s. 9; *Seaver* v. *Adams,* 66 N. H. 142, 143, 19 Atl. 776 [49 Am. St. Rep. 597], and authorities cited. And since the law puts upon her an equality, so that he now has no more power and authority over her than she has over him, no reason would seem to remain why she may not acquire a separate domicile for every purpose known to the law. If, however, there are exceptional cases, when for certain purposes it might properly be held otherwise, there can be in this jurisdiction no reason for holding that when the husband has forfeited his marital rights by his misbehavior, the wife may not acquire a separate domicile, and exercise the appertaining rights and duties of citizenship with which married women have become invested. To hold otherwise would not only break the line of consistency and progress which has been steadily advanced until the ancient legal distinctions between the sexes, which were adapted to a condition that has ceased to exist and can never return, have been largely swept away, but it would also be subversive of the statutory right of voting and being elected to office in educational matters which wives now possess (Pub. Sts., c. 90, ss. 9, 14), inasmuch as it would compel the innocent wife to reside and make her home in whatever voting precinct the offending husband might choose to fix his domicile, or to suffer the deprivation of the elective

franchise; and if he should remove his domicile to another State and she should remain here, the exercise of all her rights dependent upon domicile would be similarly affected.

"This cannot be the law. On the contrary, the good sense of the thing is, that a wife cannot be divested of the right of suffrage, or be deprived of any civil or legal right, by the act of her husband; and so we take the law to be. Whenever it is necessary or proper for her to acquire a separate domicile, she may do so. This is the rule for the purposes of divorce (*Payson* v. *Payson,* 34 N. H. 518; *Cheever* v. *Wilson,* 9 Wall. 108, 124 [19 L. Ed. 604]; *Ditson* v. *Ditson,* 4 R. I. 87, 107; *Harding* v. *Alden,* 9 Me. [9 Greenl.] 140 [23 Am. Dec. 549]); and it is the true rule for all purposes."

In the case of *Williamson* v. *Osenton,* 232 U. S. 619, 625, 34 S. Ct. 442, 58 L. Ed. 758, the wife of Osenton left their domicile in West Virginia and undertook to acquire a domicile in Virginia for the purpose of bringing a suit for damages against her husband's paramour in West Virginia in the federal court. The jurisdiction of that court was predicated on the fact of diversity of citizenship which became an important issue in her suit. The court said in part: "The essential fact that raises a change of abode to a change of domicile *is the absence of any intention to live elsewhere* (Story, Conflict of Laws, section 43); or, as Mr. Dicey puts it in his admirable book, *'the absence of any present intention of not residing permanently or indefinitely in'* the new abode. Confl. L. (2d ed.) 111. * * * But the case was submitted to the court upon a written statement, upon which we presume both sides expected the court to rule. To give the supposed ambiguous meaning to the words 'for an indefinite time' in that statement would be to assume that the parties were trying to get the better of each other by a quibble. We must take them to mean: For a time to which the plaintiff did not then contemplate an end. *If that is their meaning, the motive for the change was immaterial, for,* subject to the second question to be discussed, *the plaintiff had a*

*right to select her domicil for any reason that seemed good to her. With possible irrelevant exceptions the motive has a bearing only when there is an issue open on the intent.* Cheever v. *Wilson,* 9 Wall. 108, 123, 19 L. Ed. 604, 608; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181, 191, 192, 20 S. Ct. 311, 44 L. Ed. 423, 430, 431. With that established as agreed, there is no doubt that it was sufficient to work the change. *Mitchell* v. *United States,* 21 Wall. 350, 352, 22 L. Ed. 584, 587; Dicey Confl. L. (2d ed.) 108, 113, 114.

"The second subdivision of the question may be answered with even less doubt than the first. *The very meaning of domicil is the technically preeminent headquarters that every person is compelled to have in order that certain rights and duties* that have been attached to it by the law may be determined. *Bergner & E. Brewing Co.* v. *Dreyfus,* 172 Mass. 154, 157, 51 N. E. 531, 70 Am. St. Rep. 251. In its nature it is one; and if in any case two are recognized for different purposes, it is a doubtful anomaly. Dicey, Confl. L. (2d. ed.) 98. The only reason that could be offered for not recognizing the fact of the plaintiff's actual change, if justified, is the *now vanishing fiction of identity of person.* But if that fiction does not prevail over the *fact* in the relation for which the fiction was created *there is no reason in the world why it should be given effect in any other.* However it may be in England, that in this country a wife in the plaintiff's circumstances may get a different domicil from that of her husband for purposes of divorce is not disputed and is not open to dispute. *Haddock* v. *Haddock,* 201 U. S. 562, 571, 572, 26 S. Ct. 525, 50 L. Ed. 867, 870, 871, 5 Ann. Cas. 1. This she may do *without necessity* and simply from choice, as the cases show, *and the change that is good as against her husband ought to be good as against all.* In the later decisions the right to change and the effect of the change are laid down in absolute terms. *Gordon* v. *Yost* [C. C.] 140 Fed. 79." (Italics supplied.)

In the case of *McCormick* v. *U. S.* — U. S. Customs Rep. — (U. S. Daily) January 21, 1930, page 7, column 2, and *Id.*

January 22, 1930, page 7, columns 6-7, from the United States Court of Customs Appeals, relief was sought from the imposition of a tariff duty on Mrs. McCormick's wearing apparel. The claim was based on the contention that Mrs. McCormick was a resident of France although her husband, Harold F. McCormick, was domiciled in Chicago, Illinois. The Tariff Act 1922, section 201, paragraph 1695 (19 U. S. C. A., section 122, paragraph 1695), provided that the personal effects of non-residents were not subject to duty.

The court stated additional facts in its opinion to be: "* * * by express agreement between them the plaintiff has during the period since they have been married resided apart from her husband in France while he lived in America; that they are friendly and living upon good terms; that they have exchanged visits; that he has visited her every year up to the last two years, and she has visited him on two or three different occasions, remaining with him two or three months each time, and that the plaintiff is not dependent on her husband for support."

The court then held that Mrs. McCormick was domiciled in France and said: "At common law the wife by marriage all but lost her identity. She was in a condition bordering on slavery. By marriage the husband and the wife became one person and that person was the husband. * * *

"Though modified, the rule that a husband's domicile is the domicile of the wife still obtains. It is based upon the legal fiction that the identity of the wife is merged with that of her husband upon their marriage. At the common law the wife did not have the privilege of entering into contracts, except through her husband, and the contracts which she made with her husband were void. Exceptions to this rule came to be recognized and established by the courts, particularly in relation to domicile. It was held that through misconduct on the part of the husband constituting a matrimonial offense the wife was justified in selecting another

domicile, and in cases where the husband abandoned his wife the same right was conferred. The courts gradually modified the common-law rule of one identity for husband and wife until they finally not only recognized that a wife could enter into contractual relations with others without the aid of her husband but that she could enter into contractual relations with her husband, and thus the legal identity of husband and wife was broken. *Since she has the right to make a contract with her husband, she may contract with him upon the subject of her domicile. The husband may consent to a change of domicile for the wife and such consent may be express or implied."* (Italics supplied.)

In the case of *Rinaldi* v. *Rinaldi*, 94 N. J. Eq. 14, 118 Atl. 685, 686, it was said: *"In re Geiser's Will*, 82 N. J. Eq. 311, 87 Atl. 628, I held, as ordinary, at page 313 of 82 N. J. Eq., at page 628 of 87 Atl., that upon marriage the legal domicile of the wife merges into that of the husband as a legal sequence of the nuptial contract and the unity of domicile exists during coverture *unless the wife acquires one elsewhere by the husband's consent. That consent may be either actual or constructive and may be manifested by acquiescence,* by abandonment, or by such conduct inimical to cohabitation as would secure to the wife a decree of divorce *a vinculo* or *a mensa et thoro."* (Italics supplied.)

With respect to the effect of the modern trend upon the rigor of the early common law rules we quote from a lecture before the Yale Law School delivered by Mr. Justice Cardoza, then Chief Justice of New York Court of Appeals, now an Associate Justice of the Supreme Court of the United States. It is a remarkable contribution to the subject: "We take a false and one-sided view of history when we ignore its dynamic aspects. The year books can teach us *how* a *principle* or a *rule* had its *beginnings.* They *cannot* teach us that what was the *beginning* shall also be the end. * * *

"I find again in a recent judgment of my own court the

case that points my meaning. We held a little while ago in *Oppenheim* v. *Kridel,* 236 N. Y. 156 [140 N. E. 227, 28 A. L. R. 320], that a woman, as well as a man, may maintain an action for criminal conversation. The court of intermediate appeal had ruled that the action would not lie. To make out the woman's disability, precedents were cited *from the time of Lord Coke.* Stress was laid upon pronouncements *in those days* that a man had a *property right* in the body of his wife. A wife, *it was said,* had none in the body of her husband. Stress was laid also upon rulings made in days when the wife was unable, unless the husband joined with her as plaintiff, to sue for any wrong. *We did not ignore these precedents,* but we held them *inconclusive.* Social, political, and legal reforms had *changed the relations, between the sexes,* and put *woman* and *man upon a plane of equality.* Decisions founded upon the *assumption* of a bygone *inequality* were *unrelated to present-day realities,* and ought not to be permitted to prescribe a rule of life. * * * One court, in its interpretation of legal history, was satisfied to treat as *finalities* the precedents of ancient year books. The other found *a stream of thought, a tendency, a movement forward to a goal.* Which, then, is the truer use of the historical method? Which exhibits the saner and sounder loyalty? Shall the significance of events be determined by transporting them to our own time and viewing them as if they were the *product of our own day and thought,* or by viewing them as of the *time* of their *occurrence,* the product of *their era,* the expression of its beliefs and habits?" Cardoza's "The Growth of the Law," pp. 104-106.

See also *Cheever* v. *Wilson,* 9 Wall. 108, 19 L. Ed. 604; *Matter of Florance's Will,* 54 Hun. 328, 7 N. Y. S. 578; *Brown* v. *Com.,* 135 Va. 480, 115 S. E. 542; *Mackenzie* v. *Hare,* 239 U. S. 299, 36 S. Ct. 106, 60 L. Ed. 297, Ann Cas. 1916 E, 645.

In affirming the judgment of the trial court we travel the path marked out by the authorities cited, which had been foreshadowed by coming events, and which leads to a "saner and sounder" conclusion than that reached by an adherence to an obsolete and vanishing common-law fiction.

*Affirmed.*