COURT OF APPEALS OF VIRGINIA

Present:  Judges Clements, Agee* and Felton
Argued at Richmond, Virginia


TRENT BLACKSON
                                              OPINION BY
v.   Record No. 1497-02-2           JUDGE WALTER S. FELTON, JR.
                                            MAY 6, 2003
ANDREA LEE BLACKSON


            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                      Timothy J. Hauler, Judge

            Charles E. Powers (Harris W. Leiner;
            Barnes & Batzli, P.C., on brief), for
            appellant.

            No brief or argument for appellee.


     Trent Blackson ("husband") contends on appeal that the trial

court (1) did not have subject matter jurisdiction over the

divorce proceedings because neither party qualified as a <u>bona</u>

<u>fide</u> resident and domiciliary of Virginia under any provision of

Code § 20-97; (2) did not have personal jurisdiction over him

because he was induced into the Commonwealth by the actions of

Andrea Blackson ("wife"), and would not have been present

otherwise; (3) erred in dividing his military pension because he

made continuous objection to the jurisdiction of the

Commonwealth's courts and never consented to their jurisdiction;

_____

     * Justice Agee participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

and (4) abused its discretion in awarding attorney's fees to wife. For the following reasons, we affirm the judgment of the trial court.

## I.   BACKGROUND

### A.   MARRIAGE AND FILING FOR DIVORCE

On February 14, 1987, husband and wife were married in Honolulu, Hawaii, where husband was stationed with the United States Marine Corps. Two children were born of the marriage. One child was born on April 21, 1989 and the other born on November 9, 1992. Husband remained an active duty Marine Corps officer throughout the marriage.

In June 1999, the Blacksons moved from Virginia Beach, Virginia, where they had lived for three years, to Guantanamo Bay, Cuba. The parties lived in Guantanamo Bay for approximately one year. On April 26, 2000, husband received official orders to report to Camp Pendleton, California. The orders separated him from Guantanamo Bay, Cuba on May 9, 2000 with a reporting date at Camp Pendleton, California no later than June 11, 2000. He reported for duty at Camp Pendleton on May 30, 2000.

Upon receiving his orders to report to Camp Pendleton, wife told husband that she and the children would be moving to California with him. However, she informed other adult family members that she intended to return to Virginia with the children and not to accompany husband to California, because of

-

his admitted infidelity and a deteriorating marriage relationship. In discussing the pending move, the Blacksons ostensibly agreed that husband would report to Camp Pendleton in advance of the family in order for the children to finish the school year. The plan was for wife, in June, to pack and ship their household items to California, travel to Virginia with the children to pick up the vehicle they left there, and drive cross-country to reunite with him.

On June 2, 2000, wife and the two children arrived in Virginia, retrieved the vehicle and drove to Richmond. Upon arriving in Richmond, she attempted to divert a portion of the household goods from the planned destination in California to a new location in Midlothian, Virginia. On June 9, 2000, seven days after arriving in Virginia, wife filed for divorce.

Sometime between June 2 and June 9, 2000, an administrative officer at Guantanamo Bay contacted husband regarding the shipment of the household goods. He informed husband that his wife was attempting to divert a portion of the shipment from its California destination. In response, husband contacted wife and learned that she did not intend to go to California, but intended to remain with the children in Virginia. As a result,

-

on June 12, 2000, he traveled to Virginia where he was served with divorce pleadings.[1]

## B.  SPECIAL APPEARANCE

On June 15, 2000, husband filed a notice of special appearance with the trial court.  A hearing was held the same day regarding whether the trial court could exercise subject matter and personal jurisdiction in this case.  As to subject matter jurisdiction, husband asserted that neither he nor wife were residents of or domiciled in Virginia for the purposes of a divorce proceeding.  He argued that neither of them owned real property in Virginia; that Texas was their home of record; and that they filed their taxes jointly in Texas.  In addition, he asserted that the provisions of Code § 20-97(3) were not met to establish subject matter jurisdiction in the trial court.

According to husband, prior to moving to Cuba, the parties lived in Virginia Beach for three years, satisfying the requirement of Code § 20-97(3)(ii).  However, on the date the divorce suit was filed, he was not "stationed in any territory or foreign country," as required by Code § 20-97(3)(i).  He was stationed at Camp Pendleton, California, where he reported for duty on May 30, 2000, when wife filed the suit for divorce on June 9, 2000.

---

[1] Husband was personally served with the bill of complaint while temporarily residing in the Chesterfield County jail for allegedly violating a protective order obtained by wife.

As to the issue of personal jurisdiction, husband asserted that the court lacked personal jurisdiction over him (despite personal service of process within the Commonwealth) because wife wrongfully induced him to come into the Commonwealth. He stated that, by using the children as bait, wife "dragged him" into the Commonwealth primarily to serve him with process in the divorce proceedings.

In response to husband's arguments, wife asserted that, for the purposes of establishing subject matter jurisdiction, both parties were bona fide residents of Virginia. She presented the following evidence: (1) one of the family's vehicles was still registered, licensed and titled in Virginia; (2) each of them possessed a Virginia driver's license, even while they lived in Cuba; (3) they held accounts in Virginia banks; (4) she had a brother, sister, and brother-in-law living in Virginia; (5) prior to her marriage, she filed taxes in Virginia; (6) she lived in Virginia for three years prior to moving to Cuba and returned to Virginia to re-establish her residency; (7) when she left Virginia to go to Cuba, she left solely because of her husband's military orders; (8) she informed her adult family members that she intended to return to Virginia and not accompany husband to California; (9) husband's orders reflect that he was detached from Cuba on May 9, 2000 and that he was to report for duty in California no later than June 11, 2000, however, wife asserted there is no evidence that he reported

-

prior to that date; (10) she arrived back in Virginia on June 2, 2000 and has not left Virginia since that date; and (11) she has no break in her Virginia residency, outside of her husband's military orders.

Wife testified that when she moved to Guantanamo Bay, it was her intent to accompany her husband there. However, when she left Guantanamo Bay, her intent was to return to Virginia, not to go to California. She asserted that in November 1999, five months after leaving Virginia to go to Cuba and after learning of her husband's infidelity, she decided to divorce husband and return to Virginia with the children. During questioning, wife conceded that she and husband had registered to vote in Texas because of the ease of absentee voting for military personnel. She further conceded that during the course of their marriage they filed taxes jointly in Texas because of the favorable income tax advantage the state offers for military personnel.

As to personal jurisdiction, wife argued that she did not lure, trick, invite or induce husband to Virginia. She asserted that he came to Virginia on his own accord and without invitation from her. He was to be served with the divorce proceedings in California, but because of his voluntary appearance in Virginia, he was served at the Chesterfield County jail, after trespassing at his brother-in-law's house in

-

violation of a protective order.  Consequently, she asserts that personal service and jurisdiction were valid.

The trial court found after the ore tenus hearing that it had both subject matter and personal jurisdiction over the parties and the marriage.  The court entered its order on August 1, 2000, nunc pro tunc June 15, 2000, the date of the ore tenus hearing.  After the trial court's announced finding at the ore tenus hearing, but prior to the entry of the order, husband filed an answer and cross-bill to wife's bill of complaint.  In his cross-bill, husband requested the court to grant him a divorce on multiple grounds, that it make equitable distribution of the parties' property, and award child custody to him, all subject to his continuing objection to personal and subject matter jurisdiction.

### C.  DISCOVERY AND TRIAL

On October 5, 2000, husband propounded discovery to wife. For a period of approximately eight months, wife failed to timely respond to several discovery requests by husband.  On April 18, 2001, the trial court entered a motion to compel discovery.  Wife again failed to respond to the discovery request.[2]  As a result, husband filed a motion for sanctions. Discovery responses were eventually delivered to husband on June

---

[2] Wife asserted in her defense that much of the material she needed to respond to the discovery requests was located in a storage unit in California, under husband's sole control.

-

19, 2001.  On May 30, 2001, wife propounded discovery on husband.  He delivered his response on June 19, 2001.

On May 10, 2002, the trial court entered a final decree of divorce, nunc pro tunc to February 7, 2002, the date the trial judge issued his opinion letter.  The order, among other things, granted wife a divorce from husband, equitably distributed the marital property, awarded wife spousal and child support, awarded wife a fifty percent interest in the marital portion of husband's military retirement plan, ordered husband to make wife the irrevocable beneficiary of his military survivor plan, and awarded wife $20,000 in attorney's fees.[3]  Husband appeals.

## II.  SUBJECT MATTER JURISDICTION

We first consider whether the trial court acquired subject matter jurisdiction over the parties and their marriage.  At the conclusion of the June 15, 2000 hearing pursuant to husband's special appearance, the trial court found that it had subject matter jurisdiction over the divorce proceedings.  It stated:

> There is compliance with the statutory provisions that there was no break in the residency of the plaintiff in this matter based upon her following Mr. Blackson-Major Blackson to Guantanamo Bay Cuba, for the purposes of his military duties. Jurisdiction is proper . . . .

---

[3] The trial court had previously awarded the parties joint legal custody of their minor children with physical custody awarded to wife.

-

Husband contends that the trial court erred in finding that it possessed subject matter jurisdiction on the grounds that wife qualified as a <u>bona</u> <u>fide</u> resident and domiciliary of Virginia for the requisite time period.  We disagree.

### A.    STANDARD OF REVIEW

The issue of subject matter jurisdiction in a divorce proceeding requires a determination of both domicile and <u>bona</u> <u>fide</u> residency.  That determination presents a mixed question of law and fact, reviewable on appeal.  <u>Adoteye v. Adoteye</u>, 32 Va. App. 221, 226, 527 S.E.2d 453, 456 (2000).  We give great deference to the trial court's factual findings and view the facts in the light most favorable to the prevailing party below, in order to review the trial court's application of the law to the facts.  <u>Caplan v. Bogard</u>, 264 Va. 219, 225, 563 S.E.2d 719, 722 (2002).

Code § 20-97 provides:

> No suit for annulling a marriage or for divorce shall be maintainable, unless one of the parties is and has been an actual bona fide resident and domiciliary of this Commonwealth for at least six months preceding the commencement of the suit . . . .[4]

"The words 'domiciled' and 'resident' are technical words, and, according to the usual rule of construction of statutes, are presumed to have been used in their technical sense.  This

---

[4] Based on the facts of the case before us, we conclude that subsections 1-4 of Code § 20-97 are inapplicable.

-

is especially true where both words are used in the same section of the statute."  Towson v. Towson, 126 Va. 640, 651, 102 S.E. 48, 52 (1920).

> There is . . . a wide distinction between domicile and residence, recognized by the most approved authorities everywhere. Domicile is defined to be a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time.  To constitute a domicile, two things must concur - first, residence; secondly, the intention to remain there.

Long v. Ryan, 71 Va. (30 Gratt.) 718, 719 (1878) (emphasis in the original).  "'Mere change of place is not change of domicile.  Mere absence from a fixed home, however long continued, cannot work the change.  There must be the [intention] to change the prior domicile for another. . . . Until the new domicile is acquired, the old one remains . . . .'"  Cooper's Adm'r v. Commonwealth, 121 Va. 338, 347, 93 S.E. 680, 682 (1917) (quoting Lindsay v. Murphy, 76 Va. 428, 430 (1882)).

> Within the purview of [Code § 20-97], . . . to have been an "actual bona fide resident of this State" for [six months] preceding the institution of a suit for divorce, means to have had in this State throughout that period an actual bona fide permanent abode, as contradistinguished from a sojourn, or transitory abode in this State or elsewhere. The plaintiff need not have been physically present in Virginia every day during that period; but it is essential that, during such part of that year as he was absent from Virginia, he has actually maintained in good

-

faith at least a locality somewhere in
Virginia as his permanent abode.

     *      *      *      *      *      *      *

If a person, who has theretofore in good
faith established and is then maintaining a
permanent abode in the State, goes from the
State, and while absent therefrom
continuously in good faith maintains that,
or some other place or locality in the
State, as and for his permanent abode, the
establishment of a sojourn, or transitory
abode, outside the State will not (so long
as his physical residence elsewhere is
essentially transitory or a sojourning) put
an end to his being an "actual bona fide
resident of this State" within the meaning
of [Code § 20-97].  This is true even though
his absence from the State be of long
duration.

Hiles v. Hiles, 164 Va. 131, 137-38, 178 S.E. 913, 915-16

(1935).

## B.  DOMICILE

When wife filed for divorce on June 9, 2000, she satisfied

the domiciliary requirement of Code § 20-97.  She re-established

her domicile, indeed if she ever lost it.[5]  All the foregoing

facts were sufficient indicia to establish her residency in

Virginia and her intent to stay in Virginia for an unlimited

time.

---

[5] Pre-marital domicile is a factor for the trial court to
consider in determining the present claim of domicile.  Prior to
her marriage, wife resided in Lorton, Virginia.  She moved to
Virginia when she was in high school and continued to reside in
Virginia until she married husband at age twenty-five.  She
owned a townhouse, worked in Virginia, registered her car in
Virginia, paid taxes in Virginia, and registered to vote in
Virginia.

-

At her request, husband arranged to be transferred to Virginia to permit wife to be near her sister, who was suffering from a terminal illness. During the succeeding three years, they resided in Virginia Beach. The couple registered their motor vehicles in Virginia. Wife also registered to vote in Virginia in order to vote in the 1996 Presidential election.

Husband asserted that wife was not domiciled in Virginia at the time she initiated the divorce proceedings. He asked the trial court to give significant weight to wife having been previously registered to vote and having filed federal income tax returns in Texas. We decline to do so. Wife never resided in Texas. Furthermore, her purpose in filing joint tax returns with her spouse in Texas was solely to take advantage of the tax benefits afforded to military personnel.[6] Husband was the sole source of income for the family, and his home of record was Texas. Prior to her registering to vote in Virginia upon her return to the Commonwealth in 1996, wife was registered to vote with her spouse in Texas to take advantage of the ease of absentee voting in that state for military personnel and their dependents.

It is clear that a wife can establish a domicile separate from that of her husband.

> In the opinion of <u>Steckel v. Steckel</u>, 118
> Va. 198, 86 S.E. 833, the court quoted with

---

[6] Military personnel who are residents of Texas do not pay state income taxes.

approval Lile's Notes to 1 Minor, at page
69, as follows:  "She may establish a
separate domicile wherever it is necessary
and proper that she do so.  And the courts
of either State may in such case determine
the status of the party domiciled there, and
such determination will be entitled to full
faith and credit in every other State."

Humphreys v. Strong, 139 Va. 146, 163, 123 S.E. 554, 559 (1924).

See also, Armstrong v. Armstrong, 350 U.S. 568, 577 (1955);

Commonwealth v. Rutherfoord, 160 Va. 524, 537-38, 169 S.E. 909,

913 (1933).

The courts have long held that the critical requirements of

establishing domicile is the absolute good faith in taking up

such residence and the animus manendi (intent to remain).  In

other words, the fact of residence and the intent to remain

prove domicile.  Humphreys, 139 Va. at 165, 123 S.E. at 560.

The parties resided in Virginia Beach for three years before

husband received orders to report to Guantanamo Bay, Cuba.  Wife

left Virginia to accompany her spouse to that military

assignment.  Following an incident in Florida in 1999 where

husband admitted his past and continuing infidelity, wife

informed her parents she would be returning to Virginia to live.

When she left Cuba, she did exactly what she had expressed an

intent to do.

The trial court considered all of the evidence before it,

and concluded that wife had previously established Virginia as

her domicile, and left Virginia only as a temporary sojourn to

-

accompany husband to his next military duty station.  Upon learning of his continuing infidelity, she returned to her domicile.  Based on the facts found in the record, the trial court reasonably concluded that wife satisfied the domiciliary requirement of Code § 20-97.  Accordingly, we find no error in the trial court's finding on that issue.

## C.  RESIDENCY

Wife also satisfied the residency requirement of Code § 20-97.  She left Virginia in 1987 when she married husband and thereafter accompanied him on his various military assignments.  However, in 1996, she re-established her Virginia residency.  In that year, husband, at the urging of wife, secured a military assignment to Virginia so that she could be near her sister, who was terminally ill at the time.  From 1996 until they departed for husband's assignment to Cuba in 1999, the Blacksons resided in Virginia Beach.  During that time, they rented two houses in the city, registered their motor vehicles in the Commonwealth, and obtained Virginia driver's licenses.  In addition, wife registered to vote in Virginia in order to vote in the 1996 Presidential election.

Having re-established her residency in Virginia, wife retains that residency until she establishes a new one.  See Hiles, 164 Va. at 137-38, 178 S.E. at 916.  The establishment of a sojourn or transitory abode outside the state will not put an end to one's being an actual bona fide resident of the

-

Commonwealth.  Id.  In June 1999, the Blacksons moved to Guantanamo Bay, Cuba, a temporary sojourn for wife.

Prior to moving to Cuba, the Blacksons were experiencing marital problems.  Those problems continued following their move to Cuba.  In November 1999, wife received a letter from husband confessing to marital infidelities.  As a result of the infidelities and continuing deterioration of their marital relationship, she decided that she would return to Virginia, where she had family, and would seek a divorce.

In December 1999, approximately six months after reporting to Cuba for duty, the Blacksons visited wife's family in Maryland.  During the family visitations, she informed her family, including her mother and father, that she was going to return to Virginia and divorce husband.  In a discussion with her father, she contemplated not returning to Cuba.  Wife's father, after talking with both wife and husband, convinced her to return to Cuba.  However, he began assisting wife in finding an attorney in Virginia to initiate a possible divorce action.

Wife had re-established her residency in Virginia from 1996 to 1999.  Her absence from the Commonwealth while in Cuba was no more than a temporary sojourn.  Following a period of increasing marital difficulties, wife told her family that she would return to Virginia to live and to seek a divorce.  Her decision to return to Virginia in November 1999 was a re-affirmation of her Virginia residency.  Accordingly, we concur with the trial

-

court's determination that wife satisfied the residency requirement of Code § 20-97 when she filed for divorce, and conclude that the trial court did not err in finding it had subject matter jurisdiction over the parties in the divorce proceedings.

### III.  PERSONAL JURISDICTION

We next consider whether the trial court possessed personal jurisdiction over husband.  He contends that the trial court did not have personal jurisdiction over him because wife fraudulently induced him to come into the Commonwealth.  We disagree.

> Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State. The view developed early that each State had the power to hale before its courts any individual who could be found within its borders . . . no matter how fleeting his visit.

Burnham v. Superior Court of California, Marin County, 495 U.S. 604, 610-11 (1990).  "Generally, personal service on a non-resident defendant found within this jurisdiction is valid and will support a personal judgment against him."  Ragouzis v. Ragouzis, 10 Va. App. 312, 314, 391 S.E.2d 607, 608 (1990). However, the Supreme Court has recognized that personal service would not confer jurisdiction over a party where personal service is accomplished by bringing the party to be served

-

within the forum by force or fraud.  See Burnham, 495 U.S. at 613.

Fraud is an "intentional perversion of [the] truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right."  Black's Law Dictionary 660 (6th ed. 1990).  In the instant case there was no indicia of fraud perpetrated by wife.  She returned to Virginia on June 2, 2000, with the intent to remain in the Commonwealth.  On her arrival, she attempted to divert a portion of the household goods and other items from their California destination to Virginia.  She, however, failed.

When husband was informed of the attempted diversion of household goods, he subsequently contacted wife.  She informed him that she was not going to California, that the children were staying with her in Virginia, and that she was filing for divorce.  Based on that information, husband voluntarily traveled to Virginia to take his family to California.  There was no deceit or trickery involved in inducing husband to travel to Virginia.  Wife was forthright in her intention to seek a divorce and maintain custody of their children.

After his arrival in Virginia, husband was arrested for trespassing at his brother-in-law's house.  Wife sought to keep husband away from her and the children.  She filed for and obtained a protective order against him.  Husband subsequently violated the protective order and was arrested.  While in the

-

Chesterfield County jail, husband was served with divorce papers. "It is the fact of service that gives the court [personal] jurisdiction." Buttery v. Robbins, 177 Va. 368, 373, 14 S.E.2d 544, 545 (1941). The trial court properly acquired personal jurisdiction over husband.

### IV. DIVISION OF MILITARY PENSION

We next consider whether the trial court erred in dividing husband's military pension. The trial court held that it had jurisdiction to divide the military pension because, when husband sought affirmative relief through his cross-bill, he voluntarily invoked the court's jurisdiction. The trial court determined that husband's filing a cross-bill constituted a general appearance and consent to the court's jurisdiction under the federal Uniformed Services Former Spouses' Protection Act ("USFSPA"). Husband contends this ruling was error. We disagree.

Where, as in this case, military benefits are at issue, the law of the Commonwealth is preempted by the USFSPA, which controls state court proceedings to divide a service member's disposable retired pay. Under the provisions of the USFSPA, a state court may acquire jurisdiction to divide a service member's disposable retired pay in three circumstances: (1) if the member is domiciled in the state; (2) if the member is a resident of the state; or (3) if the member gives consent to the

-

state's jurisdiction.[7]  Because husband was neither a resident

nor domiciliary of Virginia at any time during these

proceedings, the court's jurisdiction to make an award under 10

U.S.C. § 1408(c)(4) depends on whether he gave his consent to

the court's jurisdiction.

Husband initially made a special appearance to contest the

court's subject matter and personal jurisdiction.  When the

court ruled that it had both subject matter and personal

jurisdiction, husband, while purporting to maintain his

objection to the jurisdictional rulings, filed a cross-bill of

complaint invoking the court's jurisdiction to grant a divorce

to him on multiple grounds, to award him child custody and child

---

[7] 10 U.S.C § 1408(c) states in relevant part:

> (1) Subject to the limitations of this
> section, a court may treat disposable
> retired pay payable to a member for pay
> periods beginning after June 25, 1981,
> either as property solely of the member or
> as property of the member and his spouse in
> accordance with the law of the jurisdiction
> of such court. . . .
>
> *     *     *     *     *     *     *
>
> (4) A court may not treat the disposable
> retired pay of a member in the manner
> described in paragraph (1) unless the court
> has jurisdiction over the member by reason
> of (A) his residence, other than because of
> military assignment, in the territorial
> jurisdiction of the court, (B) his domicile
> in the territorial jurisdiction of the
> court, or (C) his consent to the
> jurisdiction of the court.

-

support, to make equitable distribution, and to award him attorney's fees and costs.  By invoking the jurisdiction of the court to grant him affirmative relief, husband consented to the trial court's jurisdiction and satisfied the consent requirements of 10 U.S.C. § 1408(c)(4).  See Gowins v. Gowins, 466 So.2d 32 (La. 1985) (10 U.S.C.A. § 1408(c)(4) does not require express consent; member can give implied consent by making a general appearance, thereby waiving all jurisdictional objections).

In Wagner v. Wagner, 768 A.2d 1112 (Pa. 2001), the Supreme Court of Pennsylvania decided a case in some respects similar to the one before us.  Michael and Amy Wagner were married in Pennsylvania in August 1982.  Throughout the marriage, Mr. Wagner served on active duty as an officer in the United States Air Force.  In 1992, the Wagners separated.

In December 1993, Ms. Wagner filed a complaint for support. Later, in June 1994, she filed for divorce.  Personal service was effected on Mr. Wagner in Alabama in September 1995.[8] Mr. Wagner did not file an answer to the complaint for divorce. Written interrogatories relating to income and expenses were also served on Mr. Wagner.  However, he did not file an answer. In January 1998, Ms. Wagner filed an inventory of marital

---

[8] Personal service was obtained through the Pennsylvania long-arm statute.  Husband, on the other hand, received personal service while he was physically present within Virginia.

-

property, which included Mr. Wagner's Air Force retirement. Mr. Wagner did not file an inventory of marital property.

In May 1998, Mr. Wagner filed a "Refusal to Accept Jurisdiction of Court to Determine the Disposable Retirement Pay of a Member of the Armed Forces." He alleged "he did not reside and was not domiciled in Pennsylvania. He also averred that he did not consent to the trial court's jurisdiction for purposes of the Act and objected to the court's jurisdiction over his retirement pay." Wagner, 768 A.2d at 1115.

In construing 10 U.S.C. § 1408(c)(4)(C) of the USFSPA, the Supreme Court of Pennsylvania began its analysis by determining whether the statute speaks to subject matter or to personal jurisdiction. The Court determined the Act authorizes action "by those state courts that already have subject matter jurisdiction and substantive law authority under pertinent state law. Thus, Congress did not grant subject matter jurisdiction to any court over a military pension . . . ." Id. at 1117. To the contrary, the Pennsylvania court opined that § 1408(c)(4)(C) refers to personal jurisdiction. For personal jurisdiction, Congress chose not to use state law, but instead provided its own, and exclusive, test of personal jurisdiction in § 1408(c)(4)(A)-(C). Id.

The court next addressed how consent under the federal statute is established and concluded that § 1408(c)(4)(C) "is . . . limited, and refers to a military serviceperson's

-

consent to the court's authority over him to distribute his

pension."  Id.

> [I]n keeping with the federal policy to keep
> federal intrusion into the area of domestic
> relations at a minimum, the Act controls the
> authority that state family law courts have
> over a single item, military retirement
> pay. . . . Section 1408(c)(4) preempts state
> long-arm statutes only in connection with a
> court's authority to determine a military
> member's retirement pay, and leaves all
> other rules by which state courts acquire
> personal jurisdiction over a military member
> for divorce and ancillary economic issues
> untouched.

Id. at 1118.

The Pennsylvania court then concluded that under

§ 1408(c)(4)(C), "courts may not exercise the authority they are

provided in the Act to distribute a military member's retirement

pay in a divorce action, unless the member consents to the

court's jurisdiction over his person specifically to distribute

the retirement pay."  Id. at 1119.  The Pennsylvania court then

held that the trial court lacked personal jurisdiction over

Mr. Wagner to distribute his military pension under 10 U.S.C.

§ 1408(c)(4)(C).

> It is evident from the record that none of
> the action [Mr. Wagner] took constituted
> consent as we have defined it.  [Mr.
> Wagner's] acceptance of service, his
> counsel's written general appearance, his
> participation in discovery matters unrelated
> to the pay, and his attendance at a separate
> support proceeding do not suffice.  The only
> activity on [Mr. Wagner's] part which
> concerned his pay was the filing of

-

> preliminary objections to the trial court's
> jurisdiction and the refusal to consent.

Id. at 1120.

Husband took some actions that were similar to those of Mr. Wagner.  For example, he had his attorney enter a special appearance in the trial court to contest both subject matter jurisdiction over the divorce and personal jurisdiction over him.  However, unlike Mr. Wagner, husband specifically invoked the court's jurisdiction over him when he voluntarily sought affirmative relief through his cross-bill.  The cross-bill requested, among other things, equitable distribution of the parties' marital estate which includes his retirement benefits.  Our Supreme Court has held that the filing of a cross-bill constitutes a general appearance and an invocation of the court's jurisdiction.  See generally Ceyte v. Ceyte, 222 Va. 11, 14, 278 S.E.2d 791, 792 (1981) (any action taken by a litigant which recognizes the case as before the court amounts to a general appearance unless such action's sole purpose is to contest jurisdiction).

Husband could not invoke and consent to the jurisdiction of the court for equitable distribution and arbitrarily exclude his retirement pay from the trial court's jurisdiction.  Having invoked the jurisdiction of the court to equitably distribute all of the parties' property, husband cannot object to the court's exercise of its authority that he voluntarily invoked.

-

As a result, the trial court did not err in determining that wife was entitled to a portion of husband's military retirement pay under the USFSPA.

### V.  ATTORNEY'S FEES

Finally, we consider whether the trial court erred in awarding wife $20,000 in attorney's fees.  "An award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion."  Graves v. Graves, 4 Va. App. 326, 333, 357 S.E.2d 554, 558 (1987).  "[T]he key to a proper award of counsel fees [is] . . . reasonableness under all of the circumstances revealed by the record."  McGinnis v. McGinnis, 1 Va. App. 272, 277, 338 S.E.2d 159, 162 (1985).

Husband contends that the trial court improperly awarded attorney's fees, in part, because wife delayed the discovery process for approximately eight and a half months.  While it is true that wife delayed the discovery process, it was not solely attributable to fault on her part.

The record before us indicates that many of the records necessary to respond to the discovery requests propounded by husband were located in a storage unit in California, under his sole control.  He denied wife access to the records he sought to compel her to produce.  Indicative of his intent, in a September 18, 2000 letter to wife, husband wrote:

-

> Your best bet is to settle this divorce with
> me quick through mediation and try to save
> as much money as possible for yourself.  If
> not, the lawyers get richer and you are left
> BROKE.  I can make more money to replace my
> loses [sic] you idiot . . . <u>you</u> <u>can't</u>.  I
> will drag your ass into court 1000 times if
> you keep this crap up.  There will never be
> an end to it.  I swear to you . . . this
> will never, ever end if you insist on being
> unreasonable.  Mediate.  You will lose no
> matter what the outcome in court is if you
> continue on your present course.  I can
> always appeal any decision and you will have
> to pay a lawyer to defend you.

(Emphasis in the original).  As a result of husband's refusal to grant access to records, his numerous show cause filings, and motions to compel discovery, wife was forced to delay discovery and incur substantial additional legal expenses.  From the record before us in this case, we conclude that the trial court did not abuse its discretion in its award of attorney's fees.

The judgment of the trial court is affirmed.

<u>Affirmed.</u>